***CAPITAL CASE***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

No. _____

AUBREY C. TRAIL,                                                                           Petitioner

v.

ROB JEFFREYS, Director,

    Nebraska Department of Correctional Services                      Respondent

---

**PETITION FOR A WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2254**

---

LAURENCE E. KOMP
Capital Habeas Unit, Chief
MEREDITH SCHLACTER
Assistant Federal Public Defender
MANDI SCHENLEY
Assistant Federal Public Defender
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-675-0923
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org
Mandi_Schenley@fd.org


*Counsel for Aubrey C. Trail*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

Petition for a Writ of Habeas Corpus ................................................ 1

Jurisdiction ......................................................................................... 1

Introductory Statement ..................................................................... 2

Procedural History ............................................................................ 2

Statement on Exhaustion .................................................................. 8

Claims for Relief ................................................................................ 8

Claim 1:   The trial court's treatment of Mr. Trail's attempted suicide in open court violated his Fifth, Eighth, and Fourteenth Amendment rights ............................................................... 9

Claim 2:   Mr. Trail was deprived of his right to not be tried while incompetent in violation of the Fifth, Eighth, and Fourteenth Amendments by the trial court's failure to order a competency hearing despite significant evidence of his incompetence to stand trial .............................................................................. 19

Claim 3:   Mr. Trail was deprived of his right to a fair trial and his right to a jury trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because he was incompetent to stand trial and therefore unable to knowingly, intelligently, and voluntarily waive his right to be present at trial and to have a jury determine whether the aggravating circumstance was proved beyond a reasonable doubt. ...................................... 24

Claim 4:   The trial court improperly had off-the-record, *ex parte* contact with the jury in violation of the Fifth, Sixth, and Fourteenth Amendments. ............................................................... 28

Claim 5:   Mr. Trail's right to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare, and present available mitigation evidence. ............................................................... 31

A. Trial counsel failed to investigate readily available mitigation evidence and follow up on numerous "red flags" of which counsel was on notice. ................................................... 33

i

**B. Trial counsel unreasonably limited their investigation to a narrow set of records and interviews.**...........................................46

**C. Mr. Trail was prejudiced by trial counsel's failure to conduct a reasonable investigation**....................................................50

**Claim 6:    Mr. Trail's right to the effective assistance of counsel at trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution was violated by trial counsel's failure to investigate and present evidence that Mr. Trail was incompetent to proceed at the time of trial.**..........................................54

**Claim 7:    Mr. Trail was denied the effective assistance of counsel when counsel failed to allege on direct appeal that Mr. Trail's procedural due process right to not be tried while incompetent was violated.**58

**Claim 8:    Mr. Trail was denied the effective assistance of counsel when counsel failed to allege on direct appeal that Mr. Trail's substantive due process right to not be tried while incompetent was violated.** .............................................................................. 63

**Claim 9:  The trial court erred in failing to sever the non-capital conspiracy count from the first-degree murder count**....................... 68

**Claim 10:  Mr. Trail's counsel was ineffective for failing to raise on direct appeal the insufficiency of the State's evidence to prove conspiracy, which the State bootstrapped to compensate for its lack of evidence of premeditation, and for failing to raise the insufficiency of the State's evidence to prove the aggravator.** ....... 72

**Claim 11:  Mr. Trail was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial.** .................................................................................... 75

**A. Failure to move for a change of venue.** ......................... 76

**B. Failure to object to the court's improper treatment of Mr. Trail's suicide attempt**....................................................... 78

**C. Abdication of duty to advocate for client.** ................................. 81

**Claim 12:  Mr. Trail's right to the effective assistance of trial counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution was violated by trial counsel's**

failure to competently investigate and present evidence of Mr. Trail's available mental health defenses, including diminished mental capacity. ........................................................................................ 84

Claim 13:  Mr. Trail's right to the effective assistance of counsel was violated when counsel failed to raise a challenge that Mr. Trail's Due Process and Confrontation rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the sentencing judges' consideration of a Pre-Sentencing Investigation Report that included victim opinion evidence. ...................................................................................... 87

Claim 14:  Trial counsel's failure to negotiate and secure consideration for Mr. Trail's guilty plea to Count II violated Mr. Trail's right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. ......................................................................... 90

Claim 15:  Mr. Trail's guilty plea to Count II was taken in violation of his right to due process of law, and counsel was ineffective for failing to raise this violation on direct appeal. ................................................. 94

Claim 16:  Mr. Trail's Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's failure to grant a continuance and appellate counsel were ineffective in failing to raise the denial as an appellate issue. ............................................................................... 101

Claim 17:  The trial court erred in "death qualifying," but not "life qualifying", a jury that did not as a matter of law need to be death qualified because the jury does not make the sentencing determination. ......................................................................................... 107

Claim 18:  Mr. Trail was coerced into waiving his right to a jury trial in violation of *United States v. Jackson* and *Ring*. ................................. 115

Claim 19:  Mr. Trail's death sentence violates the cruel and unusual punishment clause of the Eighth Amendment because he is severely mentally ill and counsel was ineffective for failing to raise this issue at trial or on direct appeal. .................................................. 118

Claim 20:  The trial court erred in permitting the State to violate a statute mandating the sequestration of witnesses by improperly modifying the sequestration of witness order in violation of the Due Process Clause. ............................................................................... 122

Claim 21:  Mr. Trail's Sixth, Eighth, and Fourteenth Amendment rights were violated by the State of Nebraska when the district court did

not receive and review sentencing orders from all Nebraska first degree murder cases for purposes of proportionality review. ....... 125

**Claim 22: The removal of the jury from the death penalty decision deprives Mr. Trail of his constitutional right to a jury and offends contemporary standards.** ........................................................................ 129

**Claim 23: The State suppressed material and exculpatory evidence.** .... 135

**Claim 24: Nebraska does not provide an adequate and corrective post-conviction process.** ................................................................................ 137

**Prayer for Relief** ................................................................................ 145

**CERTIFICATE OF SERVICE** ........................................................ 146

**VERIFICATION** ............................................................................... 147

## Petition for a Writ of Habeas Corpus

Mr. Aubrey Trail petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. He asks the Court to vacate the judgment of the Saline County Circuit Court, under which he was (1) convicted of a single first-degree murder count, Improper Disposal of Human Remains, and Criminal Conspiracy, and (2) sentenced to death.

This petition is filed within the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Additional claims and additional facts in support of the claims stated herein may emerge as investigation of this case continues. Mr. Trail anticipates he will move to amend this habeas petition.

## Jurisdiction

Under 28 U.S.C. § 2254, a district court has jurisdiction to entertain an application for a writ of habeas corpus on behalf of a person in custody under the judgment of a state court. Mr. Trail petitions for a writ of habeas corpus to vacate his convictions and sentences because they were obtained in violation of the United States Constitution. The Court thus has subject-matter jurisdiction under § 2254.

The proper respondent to a habeas-corpus petition is a person who has custody of the petitioner. *See* 28 U.S.C. § 2243; Section 2254 R. 2(a). Mr. Rob Jeffreys, Director, Nebraska Department of Correctional Services, is responsible for the actual custody of Mr. Trail and is the proper respondent in this case. Mr. Trail resides in Tecumseh State Correctional Institution.

Under 28 U.S.C. § 2241(d), a state prisoner in custody under the judgment of a state court may bring a habeas-corpus petition in "the district court for the district

1

within which the State court was held which convicted and sentenced him." Because Mr. Trail was convicted and sentenced within the State of Nebraska, venue is proper here.

## Introductory Statement

Mr. Trail's case provides an example of what happens when the death penalty is obtained in proceedings that are bereft of the process that is constitutionally required. The means matter in a justice system – the ends should *always* be the product of a fair and meaningful process. Here, that has not occurred.

## Procedural History

This case arises from the tragic death of Ms. Sydney Loofe, on or about November 15, 2017, in Wilber, Nebraska.  Mr. Trail, along with his co-defendant, Ms. Bailey Boswell, who received a life sentence, were convicted for the murder and later dismemberment of Ms. Loofe's body. Ms. Loofe's death and that which occurred after her passing is a horrible tragedy.

Mr. Trail was convicted of a single count of first-degree murder, a single aggravating circumstance, and conspiracy to commit murder. Mr. Trail entered a blind plea to one count of Improper Disposal of Human Remains prior to trial.  Mr. Trail was sentenced to death, while his co-defendant ultimately received a life sentence on November 8, 2021.

On July 12, 2018, the State charged Mr. Trail with first-degree murder, which included the single aggravator upon which he would ultimately be tried: that the murder manifested exceptional depravity by ordinary standards of morality and

2

intelligence.[1] Mr. Trail pleaded not guilty. On March 27, 2019, an amended information was filed alleging an additional count, of Criminal Conspiracy. Mr. Trail again pleaded not guilty.

Mr. Trail's pre-trial motions sought to prevent death qualification of the jury, and to sever the non-capital counts from the capital count. There also was a competency motion filed. The trial proceeded in Saline County, Nebraska, under case number CR 18-37.

Trial counsel were Mr. Benjamin H. Murray and Mr. Joseph Murray. On June 17, 2019, the trial and jury selection commenced. On June 18, 2019, jury selection was completed. The trial's evidentiary proceedings commenced on June 20, 2019.

On June 24, 2019, Mr. Trail slit his throat with a razor blade in front of the jury. The trial court immediately subsequent to this event had *ex parte* communication with the jury, unknown to defense counsel. The trial court denied Mr. Trail's motion for a mistrial and for a competency hearing. Mr. Trail was thereafter absent from trial until July 9, 2019. The jury returned guilty verdicts on July 10, 2019. Mr. Trail then waived the jury's consideration of the single charged aggravator.

Mr. Trail's post-trial motions for a new trial and a challenge to the Nebraska death penalty statute were denied. His request for mitigation funding was granted

---

[1] The State dropped an aggravator that alleged a substantial prior history of serious assaultive or terrorizing criminal activity.

2

– but never fully used. Further, his request for a continuance premised upon the pandemic was denied.

After recusal of a judge, the three-judge sentencing panel consisted of the Hon. Michael Smith, Hon. Vicky Johnson, and Hon. Susan Strong. On March 11, 2021, the three-judge panel heard evidence from the State in support of the single aggravating circumstance. The State called four witnesses to testify and introduced numerous exhibits. After the State's presentation of evidence, trial counsel was given the opportunity to adduce mitigation evidence, but counsel did not call any witnesses on Mr. Trail's behalf. The proceedings began and ended on that same day.

After the presentation of aggravating and mitigating evidence, the panel asked parties to submit briefs in support of their sentencing arguments. The trial court's judgment imposing death was entered on June 9, 2021. No jury opined on the existence of the aggravating circumstance or the proper penalty to impose. The operation of the statute coerced an earlier jury waiver at the aggravation hearing.

Mr. Trail timely pursued a direct appeal. The appeal of his convictions and sentences to the Nebraska Supreme Court proceeded under Case No. S-21-557. He was represented by a single attorney, Mr. Benjamin H. Murray, one of his former trial attorneys, in that appeal. Mr. Trail raised seven Assignments of Error, which encompassed 24 Propositions of Law in the appeal. The Assignments raised were:

- The district court erred and abused its discretion in death qualifying the jury.

- The district court erred and abused its discretion in denying defendant's pretrial motion to sever.

3

- The district court erred and abused its discretion in allowing an identified witness to remain in the courtroom during the trial in violation of its own sequestration order.

- The district court erred and abused its discretion in denying Mr. Trail's motion for mistrial.

- The district court erred and abused its discretion in denying Mr. Trail's motion for new trial.

- Nebraska's death penalty statute is unconstitutional because it permits judges, not juries, to make factual findings necessary to impose death sentences, in violation of the Sixth and Eighth Amendments.

- The sentencing panel erred when balancing the aggravating circumstances against the mitigating circumstances and concluding that Mr. Trail's case merits death when compared to similar cases.

On November 10, 2022, the Nebraska Supreme Court affirmed the convictions and sentence. *State v. Trail*, 981 N.W.2d 269 (Neb. 2022).

Thereafter, Mr. Trail was abandoned by his direct appeal counsel. Neither a rehearing motion, a motion to stay the mandate (required by Nebraska rules to be filed with the rehearing motion), nor ultimately a petition for writ of certiorari in the United States Supreme Court were filed. Instead, and in conflict with counsel's above filing obligations, on November 29, 2022, Mr. Benjamin Murray sought to withdraw from Mr. Trail's case. Mr. Murray asserted (incorrectly) that "withdrawal can be accomplished without material adverse effect on the interests of the defendant."

Three days later, on December 2, 2022, the Nebraska Supreme Court granted the motion. Thus, at a critical moment, Mr. Trail was left with no counsel.

4

On December 4, 2022,[2] Mr. Trail mailed for filing a motion requesting

counsel, stating:

> I am making a request with this letter
> that I be appointed an attorney for the
> post conviction phase. If there are papers I
> need to fill out I ask that you send
> them to me or that you send me any information
> I need in how to go about getting an
> attorney for what comes next in the appeals
> process.
> Thank you
> [signature]
> FILED

(highlight added).

On December 14, 2022, ten days after mailing and seven days after

docketing, the Nebraska Supreme Court denied the motion. It is unknown how long

the mail service took for Mr. Trail to receive this notice because he remained

without counsel. Regardless and undeterred, Mr. Trail acted with urgency and went

to another court to request the appointment of counsel.

On December 21, 2022,[3] Mr. Trail mailed for filing in the trial court a motion

requesting counsel, stating:

---

[2] The Nebraska Supreme Court docketed the mailed filing on December 7, 2022.

[3] The trial court docketed the mailed filing on January 3, 2023, a delay of thirteen days from mailing.

(highlight added).

Sixty-two days later, on February 21, 2023, the trial court appointed Mr. Timothy Noerrlinger. The docket reflects that Mr. Noerrlinger filed absolutely no motions and never checked out the record to begin his review. The one motion Mr. Noerrlinger did file pertained to himself, a motion for leave to withdraw, one-hundred and eighty-four days later, on August 24, 2023. Mr. Trail was effectively abandoned by counsel for those one-hundred and eighty-four days for purposes of his post-conviction petition.

On September 8, 2023, the court permitted the withdrawal and appointed Mr. Mark Rappl and Ms. Megan Kielty.

On December 7, 2023, Mr. Mark Rappl requested leave to withdraw. On December 9, 2023, the trial court permitted Mr. Rappl leave to withdraw.



6

On December 15, 2023, the trial court denied Mr. Trail's motion for funds to hire an investigator for purposes of state postconviction proceedings.

Ms. Kielty has currently prepared a draft to file a motion for state post-conviction relief with the Saline County District Court under case number CR18-37. The draft of that petition includes allegations (more may eventually be added when filed):

- Mr. Trail was denied the effective assistance of counsel when trial counsel failed to conduct a reasonable investigation into Mr. Trail's background, character, and mental health.

- Mr. Trail was denied the effective assistance of counsel when trial counsel failed to allege on direct appeal that Mr. Trail's substantive due process right not to be tried while incompetent was violated.

- Mr. Trail was denied the effective assistance of counsel when trial counsel failed to allege on direct appeal that Mr. Trail's procedural due process right not to be tried while incompetent was violated.

- Mr. Trail was denied the effective assistance of counsel when trial counsel failed to investigate and present evidence that his client was incompetent to proceed at the time of his trial.

- Mr. Trail's sentence of death violates the cruel and unusual punishment clause of the Eighth Amendment because he is severely mentally ill and trial counsel was ineffective for failing to raise this issue on direct appeal.

- Mr. Trail's plea of guilty and waiver of his right to jury trial were taken in violation of his right to due process of law and trial counsel was ineffective for failing to raise this violation on direct appeal.

- Mr. Trail's trial counsel was ineffective for failing to investigate competently Mr. Trail's available mental health defenses, including diminished mental capacity, and competently advise him regarding waiver of jury trial.

The United States District Court for the District of Nebraska previously appointed the Federal Public Defender's Office for the Western District of Missouri to represent Mr. Trail as federal habeas-corpus counsel on February 5, 2024, in a Sealed Order.

## Statement on Exhaustion

Each claim in the petition is exhausted, whether because Mr. Trail fairly presented the claim in state-court proceedings or it is about to be presented. To the extent a claim has not been presented, there are bases for equitable tolling to apply in part due to Mr. Trail's abandonment by counsel, *see Maples v. Thomas*, 565 U.S. 266 (2012); *Christeson v. Roper*, 574 U.S. 373 (2015), and an inadequate and non-corrective state postconviction process. *See Case v. Nebraska*, 381 U.S. 336 (1965). Record citations are provided below for those claims that Mr. Trail fairly presented to the state courts.[4]

## Claims for Relief

For the following reasons, the Court should grant the petition for a writ of habeas corpus and vacate Mr. Trail's convictions and/or death sentence.

---

[4] To the extent citations are missing, undersigned counsel apologizes to the Court. Undersigned are very recently appointed and do not have the usual depth of knowledge of the case file and transcripts as is their usual and customary practice.

**Claim 1:   The trial court's treatment of Mr. Trail's attempted
suicide in open court violated his Fifth, Eighth, and
Fourteenth Amendment rights.**

On June 24, 2019, just six days into his nearly four week-long trial, Mr. Trail
rose from his chair, yelled "Bailey [Boswell] is innocent, and I curse you all," and
used a razor blade he had concealed in a bandage to slit his own throat in full view
of the jury. Mr. Trail bled all over his white clothing and fell back into his chair.
Members of the Saline County Sheriff's Department rushed to him, while others in
the courtroom stared on in horror. Mr. Trail was taken to the hospital and received
stitches for his inches long wound. He did not return to court until more than two
weeks later, on July 9, 2019. The next day, Mr. Trail was found guilty of first-degree
murder.

After Mr. Trail's violent attempt to take his own life, defense counsel moved
for a mistrial because of the prejudicial effect of Mr. Trail's actions on the jury. Trial
counsel argued that Mr. Trail was so prejudiced by the event that he would not be
able to receive a fair trial or present a proper defense and that Mr. Trail's
competence was in question. The Court denied Mr. Trail's request for a mistrial
based on the court's voir dire of the jury, relying on juror responses to leading
questions that they could put the horrific event out of their minds. Tr. 1524. These
responses to the leading questions do not hold up given the ex parte assurances
already provided the jurors from the questioner. *See* Habeas Claim 4. Mr. Trail
raised the same arguments in his motion for a new trial, again stressing the

9

incurable prejudice of his statements and brutal attempt at suicide. The court denied the motion.

Mr. Trail's trial should have ended in a mistrial, or he should have been granted a new trial. Alternatively, the court should have granted the motion for a competency evaluation after Mr. Trail attempted to take his own life in front of the jury. An impartial jury is necessary to preserve a defendant's right to fair trial, and Mr. Trail's jury was anything but. His gruesome display of self-harm inherently prejudiced the jury, such that it was impossible for jurors to separate Mr. Trail's throat slitting from the murder and dismemberment of a corpse they would hear about at trial. Because neither the trial court nor the Nebraska Supreme Court protected Mr. Trail's constitutional right to due process, this Court must grant the writ, vacate his conviction and death sentence, and remand for new proceedings in state court.

The discretion to declare a mistrial "is to be exercised only in very extraordinary and striking circumstances." *Downum v. United States,* 372 U.S. 734,736 (1963) (*citing United States v. Coolidge*, 25 Fed. Cas. 622, 623 (1815) (internal quotation marks omitted)). While it is impossible to define every circumstance in which a mistrial is necessary, "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, Courts should be extremely careful how they interfere with and of the chances of life, **in favour of the prisoner**.*" Wade v. Hunter*, 336 U.S. 684, 690 (1949) (emphasis added). If, when "taking all the

circumstances into consideration, there is a manifest necessity for the act, or the end of public justice would otherwise be defeated," a mistrial is proper. *United States v. Scott*, 437 U.S. 82, 93 (1978) (*citing United States v. Perez*, 22 U.S. 579, 580 (1824)).

Although instructions or admonitions to the jury by the trial judge may under some circumstances cure potentially prejudicial events in the courtroom, "certain courtroom situations are so beyond the pale, so prejudicial, that no amount of voir dire and cautionary instructions can remedy the defect." *United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007). The United States Supreme Court has explained that prejudice is not determined by "whether jurors actually articulated a consciousness of some prejudicial effect, but rather when 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). *Holbrook* explained that "jurors will not necessarily be fully conscious of the effect [inherently prejudicial events] will have on their attitude toward the accused." *Id.* The irremediable nature of inherent prejudice is such that "little stock need be placed in the jurors' claims to the contrary." *Id.*

Mr. Trail's attempted suicide in front of the jury was inherently prejudicial, and no amount of judicial admonition or instruction could remove Mr. Trail's act from the jury's minds. This is further complicated by the multiple off-the-record *ex parte* interactions the trial court had with the jury. A brutal and public act of violence is unquestionably traumatizing, requiring immediate multiple assurances.

11

Mr. Trail's gruesome display of self-harm is precisely the urgent circumstance so beyond the pale that the Supreme Court warned about.

Neither the trial court nor the Nebraska Supreme Court considered all of the circumstances to determine the manifest necessity of a mistrial. Instead, the Nebraska Supreme Court relied on the fact that the trial court, just hours after the attempted suicide, simply admonished the jury to disregard what they saw, and then polled the members to see if they could remain impartial to support a finding that Mr. Trail failed to show prejudice. *State v. Trail*, 981 N.W.2d 269 (2022). Not only is a juror's admission of partiality or impartiality not the correct standard to determine prejudice as set forth by the Supreme Court, but common sense dictates that the average person cannot perform the mental gymnastics the trial court asked of the jury. *See Holbrook*, 475 U.S. at 570.

Essentially, the trial court asked the jury to forget that it had just witnessed a man's attempt to take his own life and to disassociate slitting his own throat from murder and the dismemberment of a corpse when determining guilt - a violent act so alarming the trial court broke every legal requirement and had multiple *ex parte* contacts to reassure the jurors everything was okay.  At minimum, the improper multiple assurances tainted the subsequent leading voir dire.

Defense counsel brought the jurors' inability to separate the event from their duty to the court's attention after it conducted voir dire of the jury. Counsel asserted that the jurors likely felt compelled to represent to the judge that they could be impartial because of the nature of the proceedings and their respect for the

12

court – the court admonished the jury that they were to disregard what they had seen and be back to court the next day at 9:00 AM, then immediately brought them individually into chambers and asked if they could follow the instructions. No juror in that position would feel able to say no.

One juror revealed her anxiety during her brief interaction with the judge. Upon entering, the judge was unsure of what juror number the woman was. She had forgotten her official juror tag, so she was wearing a replacement. The judge recognized her nervousness and joked that not wearing her official tag was not a "punishable offense." Tr. 1521. The juror responded, "I was worried about being in here, you know, with a fake tag." Tr. 1521. If the juror was afraid to go in chambers and face the judge without her official tag, it is doubtful she would have been comfortable telling the judge she could not follow the court's instructions in response to a leading question compelling a "yes" answer.

The appropriate standard to determine the manifest necessity of a mistrial under these circumstances is to question whether a brutal act of self-harm in front of a jury would amount to "an unacceptable risk […] of impermissible factors coming into play." *Holbrook*, 475 U.S. at 570. Mr. Trail's bloody act of violence against himself, committed in front of the jury, was undoubtedly an "impermissible factor" that should not have "come into play" during guilt determination. *Id.* Yet the court allowed it to be a factor.

The court was clearly aware of how shocking and horrific the sight was, because within seconds of Mr. Trail's act of slitting his own throat, the court ordered

the cameras in the courtroom to "[s]top recording" and the bailiff to "[t]ake the jury out." Tr. 1497. The court recounted for the record that it had cleared the courtroom completely. Tr. 1498. The court also admitted to talking to the jury "a couple of times to reassure them." Tr. 1498. In an obvious attempt to whitewash the record, in reply to defense counsel's statement that "[h]e just slit his throat in front of all of us," the court stated simply, "I understand. I have not seen anything today that would call his competency into question." Tr. 1529. The court was clearly worried about the courtroom, the jury, and the public at the time of the violent event, but as soon as the prospect of a mistrial was raised, the court pretended nothing of concern had happened except misbehavior by Mr. Trail. The court's later comments implying "nothing to see here," and the Nebraska Supreme Court's willfully blind acceptance of that sentiment, is revisionism this Court should not allow.

Further, the court's nearly immediate poll of the jury's impartiality failed to account for the *Holbrook* Court's warning that jurors will not always be fully conscious of the effect the inherently prejudicial event may have on their attitude toward the defendant. *Id.* Because of the inherently prejudicial nature of Mr. Trail's suicide attempt, the court should have placed "little stock" in the jury's indication that they could remain impartial. *Id.*

Because the Nebraska Supreme Court failed to apply the correct U.S. Supreme Court standard and instead applied an incorrect standard in its decision to uphold the trial court's denial of Mr. Trail's motions for mistrial and a new trial,

14

its decision is both contrary to and an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

Further, the Nebraska Supreme Court's affirmance of the trial court's denial of Mr. Trail's mistrial motion was based on an unreasonable determination of facts.

 The trial court claimed, and the Nebraska Supreme Court adopted the claim, that when Mr. Trail slit his own throat with a razor blade in open court it was a "calculating gesture resulting in superficial cuts." *Trail*, 981 N.W.2d at 289. In reality, Mr. Trail's wound required many stitches and left him with an unsightly, inches-long scar that is still visible today.

Contrary to the Nebraska Supreme Court's parroting of the trial court, there is no evidence that Mr. Trail's suicide attempt was a "calculating gesture," or that it was due to anything other than profound mental illness, depression, or a desire to die. And instead of allowing the psychiatric evaluation defense counsel requested, the trial court chalked up Mr. Trail's bloody act of self-harm to a stunt, precluding it from being able to ascertain the genuine reason for Mr. Trail's behavior. The trial court's reliance on the plainly inaccurate characterizations of "calculating gesture" and "superficial cuts" as the basis to deny Mr. Trail's motion for mistrial was an unreasonable abuse of discretion. Thus, the Nebraska Supreme Court's affirmance, parroting the trial court's revisionist language, is an unreasonable determination of

the facts under § 2254(d)(2). Accordingly, this Court should grant the writ, vacate the conviction and death sentence, and remand for new proceedings in state court.

In a strikingly similar set of circumstances to Mr. Trail's, nearly half a century earlier, the Supreme Court found that when a Missouri defendant attempted suicide during his trial and did not attend trial afterward, a mistrial or new trial was necessary to preserve his constitutional right to a fair trial. *Drope v. Missouri*, 420 U.S. 162, 182 (1975). In *Drope*, the night after the State began its case, the defendant attempted to take his own life by shooting himself in the stomach. *Id.* at 166-67. He was in the hospital for weeks before he returned to court. *Id.* His attorney moved for a mistrial, but the trial judge denied the motion. *Id.* Later, in his motion for new trial, the defendant argued the trial court erred in not granting a mistrial, but the court again denied the motion, finding the defendant had shot himself "for the very purpose of avoiding trial." *Id.* at 167.

Prior to trial, the defendant had been examined by a doctor and diagnosed with a multitude of mental illnesses; that doctor suggested to counsel that further examination was warranted. *Id*. at 165 n.1. Pursuant to that recommendation, counsel filed a motion for a continuance so the defendant could undergo psychiatric evaluation to determine his competency to stand trial. *Id*. at 164. For procedural reasons, the motion was denied, defendant's counsel did not renew the motion, and the defendant was not given a psychiatric evaluation prior to trial. *Id*. at 165. After the defendant's suicide attempt, the trial court still did not order a psychiatric

evaluation. *Id.* The trial continued without the defendant present, and the jury convicted. *Id.* at 167.

The Supreme Court in *Drope* addressed whether the defendant was deprived of his due process right to a fair trial when the trial court failed to order a psychiatric evaluation to determine competency to stand trial and then conducted the trial in the defendant's absence. *Id.* at 163. The Court concluded that the appropriate course of action was to stop the trial until the defendant could undergo a psychiatric evaluation. *Id.* at 181. The Court acknowledged that, practically speaking, this could require a mistrial or new trial. *Id.* at 181-82 ("That this might have aborted the trial is a hard reality[.]")

The Court found that the trial court failed to give proper weight to available information suggesting the defendant was incompetent, particularly his mid-trial suicide attempt and pretrial evidence of mental illness. *Id.* at 179. The Court found the defendant's suicide attempt to be genuine despite the trial court's assertion that it was done "for the very purpose of avoiding trial." *Id.* at 167, noting that "a self-inflicted wound near vital organs does not suggest malingering." *Id.* at 181 n.16.

Additionally, the defendant's absence from trial bore on the inquiry in two ways: first, the Court considered that absence was due to self-harm, an act that "suggests a substantial degree of mental instability," and second, that as a result of the defendant's absence, neither the trial court nor defense counsel could observe him in the context of trial to determine if he could aid in his own defense and understand the proceedings against him. *Id.* at 181. When the Court considered all

the indicia of incompetence, "sufficient doubt of [the defendant's] competence to stand trial require[d] further inquiry on the question." *Id*. at 180. Importantly, the Court held that "even one of these factors standing alone may, in some circumstances, be sufficient" to require further inquiry. *Id*. *Drope*

While Mr. Trail and his trial are incredibly similar to the facts in *Drope*, the circumstances in Mr. Trail's case even more strongly required a mistrial or trial and a competency evaluation. Like the defendant in *Drope*, Mr. Trail had a prior history of documented, diagnosed mental illness and his competency had been questioned before. Mr. Trail likewise attempted to take his own life during trial, but unlike *Drope*, he did so in open court, in front of the jury. Eerily, both men even attempted suicide on the same date — June 24. After the act, both men were taken to the hospital and missed court for weeks. Counsel for both men immediately moved for a mistrial, and both were denied by the trial court. And similar to the statement of the trial court in *Drope* suggesting his suicide attempt was done to avoid trial, the trial court and the Nebraska Supreme Court stated that his suicide attempt was "a calculating gesture resulting in superficial cuts," both discounting the seriousness of his injury and attributing it to his desire to cause a mistrial. And essentially, the trial court in *Drope* and in Mr. Trail's case both failed to comply with due process requirements by *sua sponte* ordering a competency evaluation or granting the defense motion for a competency evaluation and a new trial.

Given the nearly identical posture of Mr. Trail's case to *Drope,* the Nebraska Supreme Court was required under § 2254 to follow the procedure it laid out.

18

Because the court failed to even consult *Drope* and its underlying precedents and utilized an incorrect standard, while parroting the trial court's factually unreasonable findings, the court's decision was both contrary to and/or an unreasonable application of clearly established federal law and an unreasonable application of the facts. 28 U.S.C. § 2254(d)(1), (2). Under *Drope*, Mr. Trail was entitled to a mistrial.

This Court should grant habeas relief on this ground individually and collectively due to the cumulative prejudice arising from the combination of this error with other trial errors in this petition. *See Drope*, 420 U.S. at 182 (noting the interrelatedness of the competency inquiry and the inquiry regarding a potential waiver of a fundamental right); *Kyles v. Whitley*, 514 U.S. 419, 441 )1995) (requiring a "cumulative evaluation" of the materiality of error, not a series of independent materiality evaluations). Accordingly, this Court should grant the writ, vacate the conviction and death sentence, and remand for new proceedings in state court.

> **Claim 2:** **Mr. Trail was deprived of his right to not be tried while incompetent in violation of the Fifth, Eighth, and Fourteenth Amendments by the trial court's failure to order a competency hearing despite significant evidence of his incompetence to stand trial.**

Despite significant evidence that Mr. Trail was suffering from mental illness and was incompetent to proceed to trial, particularly after he attempted suicide in front of the jury by slashing his throat with a razor blade in the middle of trial, the trial court refused to order a competency evaluation. Mr. Trail was evaluated only once prior to trial and the trial court denied him a competency evaluation even after

19

he attempted to kill himself in front of the jury (his suicide attempt resulted in his absence from court for most of the remainder of his trial, *see* Habeas Claim 3, *post*).

The Fourteenth Amendment's due process clause bars the criminal prosecution of a defendant who lacks competence to stand trial. *Medina v. California*, 505 U.S. 437, 440 (1992); *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential for a fair trial, including the right to the effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal quotation omitted). Every defendant must be capable of understanding the nature and object of the proceedings, consulting with his attorney, and assisting in the preparation of his defense. *Drope*, 420 U.S. at 171; *Pate v. Robinson*, 383 U.S. 375 (1966). A defendant is competent to proceed only if he has (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960).

A court violates the defendant's right to procedural due process when it fails "to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent." *Drope*, 420 U.S. at 172. The right to stand trial only when mentally competent is so important that the trial court has a duty — independent of any request by counsel — to order a competency exam when the

20

judge has reasonable cause to believe the defendant lacks mental fitness to proceed. *Pate*, 383 U.S. at 385. When confronted with a bona fide doubt about a defendant's competency, the court should "suspend the trial until such an evaluation could be made." *Drope*, 420 U.S. at 181. Even if a defendant was competent at the start of trial, the court "must always be alert to circumstances suggesting a change that would render the [defendant] unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181; *see also State v. Tilden*, 988 S.W.2d 568, 577 (W.D. Mo. 1999) (explaining that competence is not waived once a trial begins and "a court must confront and determine the issue at whatever stage of the trial it may arise.") (internal quotation omitted).

Reversible error occurs when the evidence presents "a bona fide doubt" as to the defendant's competency to stand trial, yet the trial court fails to order an evaluation. *Pate*, 383 U.S. at 385. A reviewing court must consider "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991) (internal quotation omitted). A defendant can satisfy this standard by showing that the trial judge "failed to see the need for a competency hearing when, based on the facts and circumstances known to [the judge] at the time, [he or she] should have seen such a need." *United States v. Day*, 949 F.2d 973, 982 (8th Cir. 1991) (citing *Drope*, 420 U.S. at 174-75). "Failure to provide an adequate hearing on

competency . . . deprives a defendant of his due process right to a fair trial." *Griffin*, 935 F.2d at 930.

Factors that may warrant further inquiry of the defendant's competency include the defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence. *Drope*, 420 U.S. at 180. No single factor necessarily determines whether the defendant lacks competency, but one factor may be enough. *Id.* An express doubt by the attorney for the accused also is a legitimate factor for the trial court to consider. *Id.* at 177 n.13. Other factors courts have considered include the defendant's mental health history, including suicide attempts or threats. *Id.* at 178-83; *Griffin*, 935 F.2d at 931.

Here, Mr. Trail's suicide attempt in the middle of trial triggered the court's duty under *Pate* to order a competency hearing. The court's refusal to order a competency evaluation and its insistence on continuing the trial without Mr. Trail's presence—and before the same traumatized jury that had just witnessed a horrifically violent act by Mr. Trail against himself—deprived Mr. Trail of his due process right to not be tried while incompetent. Moreover, the previously existing evidence of Mr. Trail's mental illness apart from his suicide attempt, including but not limited to a history of anxiety and prior diagnosis of schizophrenia, further supported the need for a competency evaluation and hearing. To suggest Mr. Trail's suicide attempt was anything but a genuine attempt to end his life would be completely contrary to the evidence of Mr. Trail's existing mental health struggles. The trial court had a duty to order a competency evaluation in light of the

22

significant evidence indicating a bona fide doubt that Mr. Trail was competent to stand trial, and its refusal to do so, especially after his in-court suicide attempt, deprived him of his due process rights under the Fifth, Eighth, and Fourteenth Amendments.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples v. Thomas*, 565 U.S. 266, 281 (2012). Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez v. Ryan*, 566 U.S. 1 (2012) and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

On the merits, Mr. Trail was incompetent to stand trial, the trial court deprived him of his procedural due process right by refusing to order a competency evaluation, and his rights under the Sixth and Fourteenth Amendments were violated by counsel's failure to raise this issue on appeal. This Court should grant habeas relief on this ground individually and collectively due to the combination of this error with other trial errors in this petition. *Strickland*, 466 U.S. at 695-96 (explaining that a reviewing court must "consider the totality of the evidence [and] ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."); *see also Drope*, 420 U.S. at 182 (noting the interrelatedness of the competency inquiry and the inquiry

regarding a potential waiver of a fundamental right). Therefore, Mr. Trail was incompetent to stand trial and this Court should order a competency evaluation and a new trial.

> **Claim 3:** **Mr. Trail was deprived of his right to a fair trial and his right to a jury trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because he was incompetent to stand trial and therefore unable to knowingly, intelligently, and voluntarily waive his right to be present at trial and to have a jury determine whether the aggravating circumstance was proved beyond a reasonable doubt.**

"Courts indulge every reasonable presumption against waiver" of fundamental rights. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1939). Waiver of a constitutional right must be knowing, intelligent, and voluntary. *Illinois v. Rodriguez,* 497 U.S. 177, 183 (1990). To determine a waiver has been properly effected depends on the particular facts and circumstances, "including the background, experience, and conduct of the accused." *Id.* A defendant cannot be incompetent and knowingly and intelligently waive his constitutional rights. *See Pate v. Robinson,* 383 U.S. 375, 384 (1966). A defendant is competent to proceed only if he has (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential for a fair trial[.]" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).

24

The right to be present at trial is rooted in a defendant's Fifth Amendment right to due process and Sixth Amendment right to confrontation, both of which are extended to the states through the Fourteenth Amendment. *Hopt v. People of the Territory of Utah,* 110 U.S. 574 (1884); *Illinois v. Allen,* 397 U.S. 337, 338 (1970); *Pointer v. Texas,* 380 U.S. 400 (1965). Ordinarily, a defendant who absents himself of his own volition from trial once proceedings have begun has waived his right to be present. *Diaz v. United States*, 223 U.S. 442, 456 (1912); Fed. R. Crim. P. 43.

Mr. Trail was absent from his trial for more than two weeks following his suicide attempt in open court. The Court informed the jury that "[h]e has chosen not to appear." Tr. 1530. However, Mr. Trail never waived his appearance in open court, and the right to waive his presence is personal to Mr. Trail. The court dismissively called Mr. Trail's public suicide attempt "voluntary", Tr. 1507, and claimed it did not "call his competency into question." Tr. 1529. By emphasizing the voluntariness of Mr. Trail's suicide attempt, the court improperly conflated that attempt with a voluntary waiver of the right to be present at trial. However, a voluntary suicide attempt that results in hospitalization is a far cry from a voluntary waiver of the right to be present at trial.

While Mr. Trail did voluntarily attempt to take his own life, that did not equate to a voluntary waiver of his right to appear at trial. Instead, his absence from court was the result of mental health struggles and suicidality. Moreover, because Mr. Trail's in-court suicide attempt raised "a bona fide doubt" as to his competency to stand trial, as described by the Supreme Court in *Pate,* 383 U.S. 375,

*see* Habeas Claim 2*, supra,* Mr. Trail could not knowingly, intelligently, and voluntarily waive his fundamental right to be present at trial.

A defendant's right to a trial by jury is guaranteed by the Sixth and Fourteenth Amendments. *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). The right to a jury trial is also provided by state statute. Neb. Rev. Stat. § 25-2705. In a capital case, Nebraska law provides that after a defendant is found guilty of first-degree murder, the jury hears evidence of aggravating circumstances and determines whether, beyond a reasonable doubt, the aggravating circumstances are proved. Neb. Rev. Stat. § 29-2520.

Like the waiver of other fundamental rights, waiver of the fundamental right to a jury must be express and intelligent and is not presumed where the record is silent. *Patton v. United States*, 281 U.S. 276 (1930). To be valid, waiver must be knowing, intelligent, and voluntary. *Rodriguez,* 497 U.S. at 183.

Here, the jury delivered its guilty verdict on July 10, 2019, sixteen days after Mr. Trail attempted to commit suicide in the court room by slashing his throat with a razor blade. After the court denied his counsel's motion for a mistrial and the jury convicted him of murder, Mr. Trail purported to waive his right to a jury at the aggravation hearing. On July 11, 2019, the day after the jury's verdict was announced, trial counsel informed the court that Mr. Trail was "waiving his right to having [the aggravation hearing] with this jury." Tr. 4116.

Just as with the purported waiver of Mr. Trail's right to be present at trial, however, which was not knowing, intelligent, and voluntary, Mr. Trail could not

26

knowingly, intelligently, and voluntarily waive his right to a jury trial on the aggravating circumstance. Moreover, counsel could not waive this right on Mr. Trail's behalf. In light of the "bona fide doubt" as to Mr. Trail's competency raised by his suicide attempt and mental health crisis, the court had a duty to conduct more than a cursory inquiry into the voluntariness of Mr. Trail's purported jury waiver. Had it done so, and had it ordered a competency hearing as the Supreme Court's decision in *Drope* mandated, *see* Habeas Claims 1, 2, *supra*, the court would have found that Mr. Trail was not competent and could not knowingly, intelligently, and voluntarily waive his right to a jury at the aggravation proceeding.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples,* 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this Court should grant the writ, vacate the conviction, and order a new trial. On the merits, this court should remand to state court for a new trial and/or aggravation hearing.

**Claim 4:  The trial court improperly had off-the-record, *ex parte* contact with the jury in violation of the Fifth, Sixth, and Fourteenth Amendments.**

Mr. Trail tried to kill himself in front of the jury. He slit his throat. The scene was chaotic and charged. It presented such an unusual circumstance, as noted in Habeas Claim 1, the trial court's on-the-record comments that there was "nothing to see here" ring absolutely hollow. Indeed, the trial court admitted quite the opposite on the record, and simultaneously admitted to egregious violations of Mr. Trail's rights by improperly having multiple contacts with the jurors outside the presence of Mr. Trail or his appointed counsel during an adversarial proceeding and made no record of the multiple jury contacts. If the court's "nothing to see here" sentiment was genuine, then there would be absolutely no basis to improperly contact the jurors.

The trial court noted that after Mr. Trail cut his throat, the court "talked to the jury a *couple of times* to *reassure* them." Tr. 1498 (emphasis added). Off the record assurances have no place in a public trial, and the judge made no record of the contents of her multiple reassurances to the jury. Reassure them they were safe? Reassure them as to what?  No matter the topic, it relates back to a negative inference directed at Mr. Trail. This may have been well intentioned – but it is wholly improper to have such secretive discussions. Moreover, the idea that the jury needed reassurance wholly contradicts the trial court's on-the-record claims that Mr. Trail's injuries were minor and that there was no cause for genuine concern. With no record of what the court's secret reassurances entailed, it is reasonable to

infer that they undercut the court's on-the-record statements suggesting there was "nothing to see here."

The Fifth and Sixth Amendments also protect a "criminal defendant's right to be present at all stages of the trial." *Stewart v. Nix*, 972 F.2d 967, 971 (8th Cir. 1992). A trial court must provide the defense attorney with notice and a meaningful opportunity to object. *Rogers v. United States,* 422 U.S. 35, 38 (1975); *Murphy v. Tivoli Enters.,* 953 F.2d 354, 360 (8th Cir. 1992); *United States v. Brunk,* 587 F.2d 910, 912 (8th Cir. 1978). *Ex parte* communications between judge and jury in the absence of and without notice to the defendant are "presumptively prejudicial." *United States v. Koskela*, 86 F.3d 122, 125 (8th Cir. 1996); *United States v. York,* 830 F.2d 885, 894-95 (8th Cir. 1987).

The Supreme Court has cautioned that an *ex parte* conversation between judge and jury is "pregnant with possibility for error." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460 (1978). An *ex parte* conversation with jurors by even an experienced trial judge may "generate unintended and misleading impressions of the judge's subjective personal views." *Id.* As the Supreme Court has explained, such contacts may cause the jury to misunderstand the law despite the good faith of the judge. *See id.* The Eighth Circuit has warned that "a trial judge should avoid *ex parte* communications with a jury," as words and stories can affect jurors in innumerable ways. *United States v. Harris-Thompson*, 751 F.3d 590, 597 (8th Cir. 2014). Potential problems may arise even though the court means no harm or such conversation is part of his "routine courtroom procedure." *Moore v. Knight*, 368 F.3d

936, 944 n.9 (7th Cir. 2004). Here, the trial court's *ex parte* comments to the jury, made in response to Mr. Trail's in-court suicide attempt, clearly constituted a direct comment concerning Mr. Trail and his in-court suicide attempt and how the jury should consider what they witnessed. These comments are presumptively prejudicial.

The trial court compounded the error by depriving Mr. Trail's counsel of the opportunity to be present or, at the very least, to have a court reporter present to record exactly what was said. *See Entsminger v. Iowa*, 386 U.S. 748 (1967) The State cannot overcome the presumption of prejudice in light of the secretive nature of the *ex parte* contact and the lack of record of what was said. Mr. Trail's counsel should have immediately objected when the trial court admitted to the improper jury contact (which violated the trial court's own admonitions on jury contact) and having such multiple contacts without a court reporter present, and appellate counsel should have raised these egregious errors on appeal.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281 (2012). Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez,* 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground

for relief in this Court. On the merits, this Court should remand to state court for a new trial.

> **Claim 5:** **Mr. Trail's right to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare, and present available mitigation evidence.**

"To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsels deficient performance prejudiced him." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). To show deficiency under *Strickland*, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Eighth Circuit has explained that under *Strickland*, "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993).

Defense counsel in a death penalty case is obligated to discover and present all substantial, available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000); *Kenley v. Armontrout*, 937 F.2d 1298, 1307-09 (8th Cir. 1991). "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to

31

facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), *Foster*, 9 F.3d at 726.

Moreover, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (footnote omitted). Relevant mitigating evidence "is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke,* 542 U.S. 274, 284 (2004). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation omitted).

In addition to the requirement that the sentencer be permitted to consider potentially mitigating evidence, it is also counsel's responsibility to investigate whether a defendant is ineligible for the death penalty due to intellectual disability. *See Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Moore v. Texas*, 137 S.Ct. 1039 (2017); *Brumfield v. Cain*, 576 U.S. 305 (2015); *Hall v. Florida*, 572 U.S. 701 (2014); Neb. Rev. Stat. § 28-105.01(2); *State v. Lotter*, 976 N.W.2d 721, 746 (Neb. 2022).

As discussed in further detail below, Mr. Trail's trial counsel blatantly ignored avenues of investigation identified by their mitigation specialist. Trial counsel failed to investigate readily available mitigation evidence or evidence of possible intellectual disability, limited their investigation to a narrow set of records, and failed to follow up on multiple "red flags" clearly identified in the record.

**A.      Trial counsel failed to investigate readily available mitigation evidence and follow up on numerous "red flags" of which counsel was on notice.**

On September 26, 2019—months after the guilt phase of Mr. Trail's trial was complete, more than a year after he was charged with a death-eligible offense, and nearly two years after the offense occurred—the court authorized trial counsel to retain CLS Mitigation & Consulting Services, LLC (hereinafter "CLS Mitigation") to assist in preparation for a hearing before a three-judge panel on aggravating and mitigating evidence. CLS Mitigation began its investigation in December of 2019. Trial counsel was provided with several memoranda and chronologies prepared by CLS Mitigation which identified a plethora of leads, "red flags," records, and mitigation themes requiring further investigation.

On May 11, 2020, the court approved an additional $25,000 in funds for the mitigation investigation. *See* 5/11/2020 Journal Entry; Tr. 4174-80. Despite being explicitly put on notice by CLS Mitigation about the need for additional investigation and being provided additional funding to complete that additional investigation, trial counsel utterly failed to heed this advice and did nothing with the additional funds. The CLS Mitigation reports, which contained privileged and confidential information, were received as Exhibits 903 through 917 at the

33

sentencing hearing. The docket is absent of any indication that the additional funds the court granted for the mitigation investigation were ever used.

Rather than conduct the necessary investigation or follow up on the investigative leads identified by CLS Mitigation, trial counsel simply offered these privileged, internal draft memoranda of CLS Mitigation's incomplete investigation at the sentencing hearing without providing any additional testimony to put the information contained in these reports into context. Trial counsel did so even though these memos explicitly state they are protected by attorney/client privilege and attorney work product doctrine. These reports were never meant to be shown to the court or opposing counsel, and there is no evidence to suggest Mr. Trail waived attorney/client privilege regarding these reports. They were meant to be used by trial counsel to identify areas for further investigation and guide the mitigation team in conducting said investigation. Further, the CLS Mitigation memos put counsel on notice of family members and others who still have never been interviewed by anyone representing Mr. Trail—notice trial counsel inexplicably ignored.

These reports provide a unique insight into the extent of trial counsel's failure to conduct a reasonably thorough investigation of Mr. Trail's life. A review of the content of the chronologies contained in Exhibits 903, 916, and 917 make clear that the mitigation investigation was woefully incomplete. Multiple dates are missing and unknown. Numerous mitigation witnesses were identified, but never

interviewed. For the witnesses who were interviewed, follow-up interviews were never completed, and corroborating documentation was never collected.

Most notably, Exhibit 903 provides a chronology of Mr. Trail's life, albeit an incomplete one. It identifies Mr. Trail's family members and provides brief information about some of their lives. It also identifies significant events and relationships in Mr. Trail's life. This life chronology is 62 pages long and contains 43 footnotes. Each one of these 43 footnotes identifies a need for additional investigation into a specific area. The end of the report summarizes 31 mitigation themes identified by the truncated investigation performed by CLS Mitigation. Throughout the reports there are notations made by CLS Mitigation specifying the exact next steps trial counsel needed to take in order to fulfill its duty to complete a mitigation investigation.

Inexplicably, it appears that not a single one of these steps was ever taken. Once CLS Mitigation completed the first round of investigation, counsel apparently conducted no further investigation. Below is a summary of the areas for further investigation that have been identified so far. Mr. Trail used his middle name while growing up, so witnesses, records, and other documents from his childhood refer to Mr. Trail as "Cliff." The below summary is not exhaustive because it remains highly likely additional avenues of mitigation evidence exist. Due to trial counsel's failure

to conduct a complete and adequate mitigation investigation, such necessary mitigation evidence has yet to be uncovered.[5]

## Childhood, Family & Mental Health History

The first footnote contained in Exhibit 903 identified the need to further investigate the impact of inbreeding in Mr. Trail's family. A family history of inbreeding exists on Mr. Trail's paternal side. Two first cousins on Mr. Trail's paternal side married each other. Kathy Perry, Mr. Trail's paternal aunt, stated that after these first cousins married one another, subsequent generations were "not right in the head." CLS Mitigation identified the need to further investigate this evidence because "studies confirm an increase in genetic disorders due to inbreeding, including, but not limited to, disorders of sex development and schizophrenia." Ex. 903, p. 1, n.1. There is no record of attempts to further investigate this topic.

---

[5] Importantly, Mr. Trail's appointed state postconviction counsel filed a motion in the District Court for funding for a qualified mitigation specialist to continue the mitigation investigation trial counsel left undone. The court denied that motion as "premature" because Mr. Trail had not yet filed a motion for postconviction relief. This circular ruling by the trial court has so far prevented Mr. Trail from being able to exhaust this claim in state court, because it precluded him from conducting an adequate mitigation investigation. The court's failure to provide a Mitigation Specialist and other resources interfered with Mr. Trail's ability to locate witnesses, records, and evidence crucial to proving he was prejudiced by trial counsel's deficient performance for failing to follow up on the information CLS Mitigation provided. The court's denial of funding in state postconviction proceedings violated the Supreme Court's decision in *Case v. Nebraska*, 381 U.S. 336, 336 (1965), requiring states to provide adequate corrective process for constitutional violations when they have provided a statutory avenue for postconviction relief. *See also* Habeas Claim 24.

Footnotes 2, 3, 5 through 21, 23 through 30, and 42 identified the need for further investigation into Mr. Trail's neonatal, early childhood, and adolescent incidents. Evidence of neonatal and early childhood incidents that could have contributed to mental illness/cognitive dysfunction were identified but not investigated further. Mr. Trail's mother, Joyce, was only 17 when he was born. She reported that she did not receive any prenatal care during her pregnancy. Like many teenage mothers, Joyce lived in poverty which impacted her ability to obtain appropriate nutrition and medical care. Mr. Trail's father abandoned Joyce, who was now raising two children, and she had no other support. Mr. Trail almost died from scarlet fever before he turned one. His mother reported he had an extraordinarily high fever of 108 degrees.  Mr. Trail's mother reported that he exhibited constant, inconsolable crying, which may indicate neurological health issues. Although counsel was on notice of these conditions, there is no evidence of investigation into these areas including but not limited to: efforts to seek and secure necessary medical records, consult with and retain appropriate experts, or other attempts to explore Mr. Trail's health or developmental milestones.

When Mr. Trail was 1.5 years old, his mother abandoned him and his older brother at his paternal grandparents' home. Joyce did not see her children until five years later, after she remarried. At this time, Mr. Trail and his brother resumed living with his mother and stepfather. Although Exhibit 903 suggests that during this time, Mr. Trail and Joyce were subjected to physical violence at the hands of his stepfather, the details are vague and uncorroborated due to trial counsel's

37

complete inaction. This issue was specifically identified by CLS Mitigation as a "Mitigation theme to investigate further," noting that witnessing domestic violence "impacts children's brain development." Ex. 903, p. 12, n.15. Although counsel was on notice of this issue, no further investigation was conducted. When Mr. Trail was 12 years old, Joyce's marriage ended. Mr. Trail went back to live with his paternal grandparents.

The CLS Mitigation preliminary investigation uncovered instances of incest and sexual assault that occurred in Mr. Trail's paternal grandparents' home while he resided there. Although trial counsel was on notice of this type of severe childhood trauma in Mr. Trail's environment during a critical developmental period, trial counsel did not conduct further investigation, retain appropriate expert assessments, or present other evidence or testimony regarding these events. Preliminary investigation suggested that Mr. Trail's paternal grandfather sexually assaulted two of his daughters, Betty and Martha, with his wife's knowledge, which continued into adulthood. Mr. Trail lived with his paternal grandfather and grandmother, and slept in their bed, from ages 1 to 5 and then again at age 12. During this time, Mr. Trail's paternal Aunt Betty would often stay over and sleep in bed with them. Mr. Trail's only male role model was his paternal grandfather, Toddy, who sexually assaulted his two daughters and lived by (and taught young Mr. Trail) the philosophy that it is not illegal if you do not get caught.

Trial counsel were on notice that Mr. Trail was aware of family members who were incarcerated for various crimes and that he was even assisted by his Aunt

38

Martha in escaping from jail when he was only 17 years old. However, trial counsel did not interview witnesses regarding this aspect of the family history, did not obtain conviction records or institutional records of these incarcerated family members, and presented no evidence explaining the relevance or significance of these circumstances or how they influenced young Mr. Trail's development.

Footnotes 4 and 42 related to a need to further investigate the substantial history of family mental illness. Mr. Trail's maternal aunt, Annie, was committed to psychiatric in-patient hospitals multiple times, yet no attempt was made to obtain these records. Mr. Trail's mother, Joyce, reported that everyone in her family had mental health issues, but counsel did not conduct further investigation into this aspect of the family history. In fact, trial counsel was aware that Mr. Trail himself was diagnosed with schizophrenia at some point in his life, but did not interview or call as witnesses the mental health care provider who made this diagnosis or do any adequate follow-up regarding the diagnosis. Mr. Trail also has a history of anxiety and panic attacks, but counsel failed to investigate this critical aspect of Mr. Trail's history as well.

CLS Mitigation also uncovered clues that there is evidence of mental illness on Mr. Trail's paternal side, but trial counsel did nothing to follow up on this information. According to Mr. Trail's paternal cousin, Walter Allen Shelton, Mr. Trail's father, paternal uncle, and two paternal aunts displayed erratic behavior and outward symptoms of mental illness. During an interview with Mr. Trail's paternal cousin Lisa Fortner, CLS Mitigation observed outward behavior indicative

39

of mental illness. In spite of being put on notice that members of Mr. Trail's paternal family exhibited and reported symptoms of mental illness, trial counsel conducted no investigation to confirm this information through documentary evidence and did not follow up on this relevant and important mitigating information.

Given the hereditary nature of mental illness, it is critical to investigate the presence of mental illness, not just for purposes of determining competency, but also for mitigation. As CLS Mitigation stated, "*[i]t bears much deeper investigation*." Ex. 903, n.4 (emphasis added). Although it appears from the record that trial counsel consulted with Arias Neuropsychology & Behavioral Medicine, the record is devoid of any information about the nature and extent of the services rendered or the purpose of the consultation. All that is known is that it cost $10,600. Certainly, trial counsel did not call Dr. Arias to testify, nor did they introduce any reports or evaluations that may have been completed by him. In any case, any work done by Dr. Arias is necessarily incomplete and unreliable because he was not provided with complete information about Mr. Trail psychosocial history, due to trial counsel's utter failure to investigate and obtain such information.

**Educational History Indicating Presence of Intellectual Disability and Mental Illness**

Footnotes 13, 22, and 34 of Exhibit 903 and footnote 1 of Exhibit 917 identified areas of further investigation relating to Mr. Trail's educational history. Joyce, Mr. Trail's mother, stated that Mr. Trail did not receive any type of pre-school enrichment in his paternal grandparents' home, which is critical for healthy

brain development. "Pre-school enrichment is considered critical because the brain is developing so rapidly in these early years; client had significant struggles in school and causes need to be explored." Ex. 903, n.13. In addition, a review of the sparse education records and witnesses reveal red flags and risk factors regarding Mr. Trail's cognitive impairment and mental health that were never pursued by trial counsel. Mr. Trail's fourth grade teacher told his mother to get him some "mental help." As CLS Mitigation noted in footnote 22, "What mental help did client need at this young age? What was the impact of his not receiving any interventions?" This teacher was identified but was not interviewed, and trial counsel made no effort to address the important questions raised by this teacher's recommendation for "mental help."

Mr. Trail performed poorly in school but was never tested or evaluated to determine whether he had a learning or intellectual disability. Mr. Trail's grandmother was believed to be intellectually disabled, a condition that may have both genetic and environmental components. And achievement tests administered when Mr. Trail was in school indicated he lagged below his grade level academically. Although several teachers were identified through the school records, none of those teachers were interviewed. CLS Mitigation recommended trial counsel conduct a "record review of juvenile records, interviews of all past teachers, research and insertion of brain development associated with different ages in which Cliff has trauma or life changes during his school years." Ex. 917, n.1. Yet trial counsel did not conduct such an investigation and failed to follow up on this recommendation.

Mr. Trail also attended multiple schools throughout his childhood. Footnote 34 noted the need to investigate the negative impact frequent school changes had on Mr. Trail's "educational attainment and on social development/connecting with peers." Nevertheless, there is no record of any attempt to complete the investigation into Mr. Trail's educational history that was essential for an effective mitigation presentation, nor did counsel investigate the possibility that Mr. Trail's academic struggles may have been the result of an intellectual disability.

## History of Institutionalization as a Juvenile

Footnotes 31, 32, 33, 35, and 36 of Exhibit 903 and Footnotes 1 through 6 of Exhibit 916 identified the need for additional investigation relating to Mr. Trail's numerous out-of-home placements and periods of incarceration as a juvenile. Starting when Mr. Trail was 14 years old, he was placed in multiple out-of-home placements, including foster homes, group homes, and juvenile detention centers. He was sent to the Taft Juvenile Detention Center after he attempted to escape from the John S. Wilder Youth Development Center, where he had been sent for stealing a car. Although CLS Mitigation notified trial counsel that both facilities had a history of reported abuse during the time Mr. Trail was there, trial counsel did not interview any witnesses or obtain any documents or reports to corroborate these events or explore their impact on Mr. Trail's experiences in these facilities.

The Taft Juvenile Detention Center was for children ages 14 to 18 who had committed serious violent crimes. In the early 1980s, Taft was the subject of investigations by the Tennessee Department of Corrections and Bureau of

Investigations for abuse. Ex. 915. CLS Mitigation notified trial counsel that it was necessary to interview other teens and staff who were at these facilities during the relevant time frame to discover what type of behavior Mr. Trail was exposed to while living in these abusive environments. Ex. 903, n.33. Yet trial counsel failed to do so.

At the tender age of 17, Mr. Trail was incarcerated after being charged with robbery. He was tried as an adult and ultimately sent to prison, where he was incarcerated until the age of 22. CLS Mitigation noted the need to further investigate the "impact of going to adult prison as a 17 year old whose brain was at least 8 years from maturation." Ex. 916, n.5. Trial counsel did not do so. There is no record of any attempt by trial counsel to conduct this necessary investigation into Mr. Trail's history of juvenile incarceration and out-of-home placements.

**Physical Health History**

Footnotes 7, 39, 40, and 41 of Exhibit 903 identified the need to further investigate Mr. Trail's health history. As an infant, Mr. Trail contracted scarlet fever and almost died. His mother reported that he ran a fever of 108, which is extraordinarily high, yet trial counsel did not attempt to obtain medical records or consult an expert on the potential impact of this illness on Mr. Trail's brain or other development. As an adult, Mr. Trail was stabbed while serving time in a Tennessee prison and had to have surgery. Again, counsel nevertheless did not obtain Mr. Trail's incarceration or medical records or attempt to interview witnesses. When he was 35, Mr. Trail suffered a heart attack that required the placement of a stent. In

43

2019, he suffered an acute ischemic stroke while incarcerated for this case. Also in 2019, he required surgery to remove his gallbladder. Mr. Trail has required numerous medical procedures over the years, yet trial counsel failed to investigate the origins and impacts of these medical events. Mr. Trail's health has continued to deteriorate during his current incarceration, and he has required additional medical intervention since CLS Mitigation reviewed his medical history.

As noted by CLS Mitigation, "All client's health history must be investigated. There is a strong familial history (maternal and paternal) of heart disease and early death. This impacts decisions about the death penalty and can be a mitigating factor: why choose death when the state will pay exorbitant amounts of money on appeals over the next 10 years, when, in all likelihood, client's life expectancy is very short." Ex. 903, n.40. Heart disease and strokes at such an early age also put counsel on notice to investigate potential behavioral or central nervous system impairments associated with Mr. Trail's medical condition, but this was not done. Sparse medical history was gleaned from institutional records from times when Mr. Trail was incarcerated, but no additional records were obtained, nor were additional interviews conducted, nor were appropriate medical or mental health experts consulted.

## Alleged Prior Crimes and Bad Acts

Footnote 37 of Exhibit 903 and Footnotes 1 and 6 of Exhibit 916 identified the need for further investigation into Mr. Trail's alleged prior crimes and other bad acts. As the State made ample use of during its presentation of evidence related to

aggravating factors, Mr. Trail has a lengthy criminal history. CLS Mitigation stated that it was necessary to conduct further investigation, which would involve reviewing police reports, court records, prison/jail records, probation/parole records, and interviewing key people identified in those records. Trial counsel made no effort to collect and review this vital information, resulting in counsel's failure and inability to competently challenge the state's presentation of aggravating evidence, in addition to counsel's failure to adequately present mitigating evidence. *See Rompilla*, 545 U.S. at 386 (counsel has an obligation to investigate to not only present mitigation, but also to prepare to rebut aggravating circumstances put forth by the state).

## **Relationship History**

Mr. Trail exhibited a history of attaching himself to one woman after another, including one woman who remained in touch with Mr. Trail around the date of the offense in this case. Although these women were identified as witnesses that required an interview, there is no evidence to suggest these women were interviewed by trial counsel. In order to conduct an adequate mitigation investigation, it was necessary to interview people who were close to Mr. Trail throughout his life, as they could have provided information about his mental health, cognitive functioning, and behavior. Romantic relationships can also provide valuable insight into a client's positive qualities as well as his symptoms of impairment, and often provide valuable insights into the client's humanity. Despite

the importance of investigating such relationships, trial counsel made no attempt to explore this potentially valuable source of mitigating evidence.

**B.    Trial counsel unreasonably limited their investigation to a narrow set of records and interviews.**

A competent mitigation investigation required the collection of all available records related to Mr. Trail's life. While some records related to Mr. Trail's family history, education, incarceration history, and physical health were obtained, they were woefully inadequate. Standard documents collected during a competent mitigation investigation include, but are not limited to, birth certificates, death certificates, marriage licenses, obituaries, school records, medical and psychiatric records, complete incarceration records, social services records, placement records, and police records. These records are essential because they contain additional information about the events uncovered by CLS Mitigation and would have assisted with the follow-up CLS Mitigation noted was necessary. These types of records clarify specific dates, identify other knowledgeable witnesses requiring an interview, and provide other family information that would facilitate further investigation. Trial counsel failed to obtain several important records which include, but are not limited to:

1. Birth, marriage, and death certificates of Mr. Trail's family members.

2. Obituaries for Mr. Trail's deceased family members.

3. Medical records for Mr. Trail's paternal grandmother as they relate to the stillbirth of her first child.

46

4. Hospital records related to the death of Mr. Trail's paternal cousin, Carrie Ann, who was only 12 days old at the time of her death.

5. Truancy records related to Mr. Trail.

6. Records related to Mr. Trail's maternal grandmother, who was intellectually disabled, such as social security records, school, records, institutional records.

7. Records related to Mr. Trail's maternal aunt, Annie, who was in psychiatric hospitals multiple times, including her psychiatric and institutional records.

8. Hospital records of Mr. Trail's mother during her pregnancy with him.

9. Hospital records of Mr. Trail relating to his birth and his brush with death as an infant.

10. Complete school records for Mr. Trail, including records from Franklin Road Christian Academy.

11. Complete institutional records for Mr. Trail, including records from the two juvenile detention centers, Good Shepherd's Children's Home, Coffee County Jr. High, and Tennessee Preparatory School.

12. Records related to Mr. Trail's time in foster care (which CLS Mitigation attempted to obtain, but needed assistance from trial counsel to draft a subpoena for these records, which trial counsel failed to do).

13. Complete records related to Mr. Trail's numerous arrests and incarcerations as an adult.

Obtaining these documents was critical to following up on and confirming mitigating facts and theories that were identified or suspected by counsel, and to

identify witnesses who could shed additional light on events that were important to Mr. Trail's background, character, and development. Such evidence was critical to an adequate mitigation investigation and presentation, which trial counsel utterly failed to complete.

In addition to records, a competent mitigation investigation required conducting adequate interviews of witnesses with information about the client's background, character, and development. Although CLS Mitigation interviewed ten of Mr. Trail's family members, only one was interviewed more than once and several interviews were conducted over the telephone. It appears from the record that Mr. Trail's mother, Joyce, was interviewed only once in person, and once by telephone. Exhibit 906, the memorandum of Joyce's interview, clearly states, "It will be important to follow up with her since, in this interview, *we barely scratched the surface of the family story*" (emphasis added). That Mr. Trail's mother was not thoroughly interviewed, and that no follow-up interviews were conducted with any other family members, reflects trial counsel's completely inadequate mitigation investigation, leading to an inadequate mitigation presentation.

The mitigation exhibits are rife with names of family members and other mitigation witnesses who were never interviewed at all. These include, but are not limited to: Martha ("Marti") Perry (aunt), Wayne Perry (uncle), Betty Shelton (aunt), Matthew Shelton (cousin), Billy Perry (uncle), Mickey Blaske (ex-wife), Lola Faye (half-sister), Carol Martinez (half-sister), Judy McGuire (aunt), Phillip McGuire (uncle), Debra McGuire (first cousin), Bobby Brown (former co-defendant),

48

Eddie Lamb (resident of Taft), Pete Williams (resident of Taft), Lawrence Shouppe (correctional officer), Mr. Fairweather (Associate Director at Taft), Sgt. Charles Simmons (Taft staff), Officer Donald Carter (Taft staff), Captain DeBord (Taft staff), Darrel Kinard (resident of Wilder), Ms. Swiney (fourth grade teacher), Johnnie McCormick (first grade teacher), Tim Lewis (childhood best friend), James Thompson (cousin), six teachers at Coffee County Jr. High only identified by their last names, Jeff (cousin, last name unknown), Jeanette (cousin, last name unknown), Lisa (cousin, last name unknown), and others who have yet to be identified.

There is no doubt that the failure of trial counsel to investigate all the above-mentioned themes, leads, red flags, and records fell well below the standard of practice for competent capital defense attorneys. Moreover, trial counsel did not call a single witness to testify in mitigation, despite advising the trial court that they intended to do so and that Mr. Trail requested such testimony be presented. Tr. 4182. Indeed, counsel even informed the court that "failure to try to get those people here is likely or possibly ineffective assistance and grounds for appeal." *Id.* Due to counsel's wholly inadequate mitigation investigation, they also failed to obtain evidence to provide to relevant expert witnesses and failed to call any such experts to testify in mitigation or in opposition to the state's presentation of the single aggravating circumstance. The investigative efforts and mitigation presentation by trial counsel in the trio of cases where the United States Supreme Court found ineffective assistance of counsel were much more robust and thorough than in the

present case. *See Williams*, 529 U.S. 362; *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S. 374. As discussed in more detail below, not only was trial counsel's performance deficient, but that deficient performance prejudiced Mr. Trail.

**C.    Mr. Trail was prejudiced by trial counsel's failure to conduct a reasonable investigation.**

Mr. Trail was prejudiced by trial counsel's utterly deficient performance because the available mitigating evidence that was not discovered "might well have influenced" the sentencer's appraisal of his moral culpability. *Wiggins,* 539 U.S. at 538. Nebraska statute makes clear that the death penalty "shall only be imposed in those instances when the aggravating circumstances existing in connection with the crime outweigh the mitigating circumstances." Neb. Rev. Stat. § 29-2519. The sentencer is not limited to only considering those mitigating factors outlined in Neb. Rev. Stat. § 2523(2), and a defendant may offer any evidence on the issue of mitigation. *State v. Joubert*, 399 N.W.2d 237 (Neb.1986). *See also State v. Moore*, 316 N.W.2d 33  (Neb. 1982) (the sentencing court should be liberal in admitting evidence the defendant asserts is a mitigating factor); *State v. Victor*, 457 N.W.2d 431  (Neb. 1990) (The courts are required to consider any relevant evidence in mitigation).  The Nebraska Supreme Court has repeatedly stated that:

> It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations required the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present…

*State v. Reeves,* 476 N.W.2d 829, 836 (Neb. 1991) (quoting *State v. Dixon*, 283 So.2d 1 (Fla. 1973) and citing *State v. Stewart*, 197 N.W.2d 497 (Neb. 1977)). When the

sentencer in a capital case is tasked with weighing aggravating and mitigating circumstances, prejudice must be found if there is a reasonable probability that at least one member of the three-judge panel would have struck a different balance. *Wiggins,* 539 U.S. at 537.

Here, the three-judge panel found one aggravating circumstance and no statutory mitigating circumstances. Although the panel acknowledged Mr. Trail's bad childhood as a non-statutory mitigating circumstance, it gave that mitigating circumstance little weight compared to the significant weight given to the single aggravator. *See* Sentencing Order, p. 26. Had counsel conducted the adequate mitigation investigation required by the constitution and the United States Supreme Court, and presented that evidence to the panel—rather than presenting only internal, privileged memoranda identifying mitigating themes that required follow-up, highlighting counsel's failure to conduct that follow-up, and failing to present a **<u>single</u>** lay or expert witness to testify in mitigation—there is a reasonable probability the sentencing panel would have reached a different determination of the mitigating evidence and "struck a different balance" between the mitigating and aggravating evidence. *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (quoting *Wiggins*, 539 U.S. at 537); *Sears v. Upton*, 561 U.S. 945, 954-55 (2010).

Counsel's deficiencies also prevented Mr. Trail from providing any meaningful rebuttal to the State's aggravation case. *Rompilla*, 545 U.S. at 386. Counsel's deficient performance precluded the panel from hearing significant

evidence that would have provided "a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

Moreover, the state postconviction court's current refusal to provide funds to conduct a mitigation investigation for postconviction proceedings precluded counsel from identifying additional mitigating evidence that would demonstrate the extent of the prejudice to Mr. Trail caused by trial counsel's deficient performance. In this regard, the circumstances in *Reeves* are instructive. In that case, the three-judge panel failed to consider evidence of Reeves' intoxication as a mitigating factor. Reeves' convictions were affirmed on direct appeal. *See State v. Reeves,* 344 N.W.2d 433 (Neb. 1984). He was denied postconviction relief by the Lancaster County District Court and the Nebraska Supreme Court affirmed. *State v. Reeves*, 453 N.W.2d 711 (Neb. 1990). The case was appealed to the United States Supreme Court, which remanded the case back to the Nebraska Supreme Court in light of its decision in *Clemons v. Mississippi*, 494 U.S. 738 (1990) (requiring independent examination of the trial record, presentence investigation, and findings of the sentencing panel in order to determine existence or nonexistence of aggravating and mitigating circumstances). On remand, the Nebraska Supreme Court found that the failure of the three-judge panel to consider evidence of Reeves' intoxication was not harmless error because "we are unable to determine that the weighing analysis in the minds of the three-judge panel would have been the same if mitigating circumstance (2)(g) had been factored into the balance." *State v. Reeves,* 476 N.W.2d at 837.

52

Similarly, the postconviction court in Mr. Trail's case cannot fairly or reasonably determined that the weighing analysis of the three-judge panel would have been the same if they had factored in even just one piece of mitigation evidence that trial counsel failed to discover. A mitigation investigation is absolutely necessary to allow counsel on postconviction to conduct the thorough investigation that should have been done by trial counsel, but counsel is currently precluded from doing so by the court's circular ruling that the request for a mitigation specialist was premature because no postconviction motion had yet been filed. Should this Court find the record sparse with regard to the prejudice prong of *Strickland*, it should fault the postconviction court's failure to provide Mr. Trail the ability to conduct a mitigation investigation in postconviction because it interfered with Mr. Trail's ability to develop and present evidence to prove prejudice.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. at 266 he is entitled to develop and present this ground for relief in this Court.

On the merits, trial counsel performed deficiently and there is a reasonable probability that a sentence less than death would have been returned, or that Mr.

Trail would be ineligible for the death penalty. Therefore, this Court should grant the writ, vacate the death sentences and remand for imposition of a life sentence.

> **Claim 6:** **Mr. Trail's right to the effective assistance of counsel at trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution was violated by trial counsel's failure to investigate and present evidence that Mr. Trail was incompetent to proceed at the time of trial.**

The Fourteenth Amendment's due process clause bars the criminal prosecution of a defendant who lacks competence to stand trial. *Medina v. California*, 505 U.S. 437, 440 (1992); *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential for a fair trial, including the right to the effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal quotation omitted). Every defendant must be capable of understanding the nature and object of the proceedings, consulting with his attorney, and assisting in the preparation of his defense. *Drope*, 420 U.S. at 171; *Pate v. Robinson*, 383 U.S. 375 (1966). A defendant is competent to proceed only if he has (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and (2) a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960).

It is the duty of trial counsel to "conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the

54

merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). This responsibility necessarily includes investigating questions arising out of a defendant's potential incompetence to stand trial and requesting a competency evaluation and hearing when appropriate. *See Drope*, 420 U.S 162; *Pate*; 383 U.S. 375.

Here, trial counsel conducted no pre-trial investigation into Mr. Trail's mental health and psychological history as well as that of his family, despite red flags suggesting Mr. Trail suffered from mental health struggles. Had counsel conducted an adequate pre-trial counsel would have been well positioned to move the trial court for a more accurate and reliable competency evaluation prior to trial, rather than the single evaluation that was conducted before even the superficial mitigation investigation began. Moreover, had counsel investigated Mr. Trail's history of mental illness prior to his in-court suicide attempt, they would have been able to provide the court with evidence that Mr. Trail's act of slitting his throat was the culmination of his pre-existing depression and serious mental illness.

In a case remarkably similar to Mr. Trail's, *Williamson v. Ward*, trial counsel conducted a shallow and superficial investigation of Williamson's mental health and competence prior to trial and did not reopen his investigation when Williamson acted out during trial. 110 F.3d 1508 (10th Cir. 1997). Williamson became verbally abusive in court and threatened his trial counsel, who later swore, "On the whole I found my representation of Mr. Williamson to be an extremely unpleasant experience and I was glad to get this case over with." *Id.* at 1512.

Like Mr. Trail's trial counsel, Williamson's counsel limited his investigation of Williamson's mental health. He obtained a psychiatric report finding Williamson competent to proceed and two letters from psychologists questioning his ability to function, but trial counsel failed to explore the issue further. The Tenth Circuit "agree[d] with the district court that [trial counsel] did not exercise reasonable professional judgment in deciding to limit his investigation of his client's mental condition to the three documents described above, and to rely solely on Dr. Garcia's letter in deciding not to request a competency determination." *Williamson*, 110 F.3d at 1517. Habeas relief was granted because Williamson's impaired ability to defend himself undermined the reliability of his trial.

Mr. Trail's case also strongly resembles *Rompilla*, 545 U.S. at 392, in which pretrial mental health examiners initially found "nothing useful" to the defense but reconsidered their findings after habeas counsel uncovered Rompilla's history of mental illness and parental violence, which raised "plenty of 'red flags' pointing up a need to test further." Rompilla's counsel were ineffective for failing to uncover information that "the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders." *Id.* at 391.

Likewise, Mr. Trail's trial counsel had plenty of red flags staring them in the face. Two things are abundantly clear from the record: first, Mr. Trail acted against his own best interests and did not contribute positively to his own defense, and second, trial counsel did not reasonably investigate the possibility that this was the product of mental illness, despite the red flags suggesting it was. A reasonable

56

investigation would likely have caused examiners to find Mr. Trail incompetent to assist counsel in his defense. Trial counsel's performance here was deficient. *Strickland*, 466 U.S. at 688.

"[W]ith respect to the prejudice prong of a claim of ineffective assistance of counsel, [a petitioner] need only demonstrate a 'reasonable probability' that he was incompetent, 'sufficient to undermine confidence in the outcome." *Williamson,* 110 F.3d at 1519 (citing *Bouchillon v. Collins,* 907 F.2d 589, 595 (5th Cir. 1990)) (quoting *Strickland,* 466 U.S. 668, 694 (1984)). Mr. Trail's personal and family history of serious mental illness, culminating in his in-court suicide attempt during trial, amply demonstrates such a reasonable probability. Had counsel conducted an adequate investigation into Mr. Trail's mental health and presented that information to support the request for a competency evaluation, it is reasonably likely Mr. Trail would have been found incompetent to stand trial. Counsel's failure to do so violated Mr. Trail's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1

and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

On the merits, Mr. Trail was incompetent to stand trial, and his rights under the Sixth and Fourteenth Amendments were violated by counsel's failure to adequately present this issue at trial. This Court should grant habeas relief on this ground individually and collectively due to the combination of this error with other trial errors in this petition. *Strickland*, 466 U.S. at 695-96 (explaining that a reviewing court must "consider the totality of the evidence [and] ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."); *see also Drope*, 420 U.S. at 182 (noting the interrelatedness of the competency inquiry and the inquiry regarding a potential waiver of a fundamental right). Thus, this Court should vacate his conviction and death sentence and order a competency evaluation and a new trial.

> **Claim 7:  Mr. Trail was denied the effective assistance of counsel when counsel failed to allege on direct appeal that Mr. Trail's procedural due process right to not be tried while incompetent was violated.**

The constitutional right of a defendant not to be compelled to defend himself while not mentally fit to do so has both substantive and procedural elements. The mental fitness of the accused is so important to the integrity of a criminal trial that the Due Process Clause also requires the trial court stop proceedings to inquire into the defendant's competency when there are reasonable grounds to question the defendant's fitness to proceed: "Competency claims can raise issues of both

58

substantive and procedural due process." *Walker v. Att'y Gen.*, 167 F.3d 1339, 1343 (10th Cir. 1999). A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent. *Id.* at 1343-44. Accordingly, an individual raising a procedural competency claim is held to a lower burden of proof than one raising a substantive competency claim. *See id.* at 1344; *McGregor v. Gibson*, 248 F.3d 946, 951, 952 (10th Cir. 2001).

The substantive right at stake is the prohibition of the trial of mentally incompetent defendants. The Court has held that "an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' [citation omitted] – the basic fairness of the trial itself." *Cooper,* 517 U.S. at 364. Because the competence of the accused is essential to the fairness and reliability of the proceedings, and because of the inherent difficulty of conducting a *nunc pro tunc* hearing on the defendant's competence, there is a procedural due process right to a contemporaneous competency hearing in the face of evidence that the defendant may be incompetent. *Dusky,* 362 U.S. 402; *Drope*, 420 U.S. 162; *Pate*, 383 U.S. 375.

The test applied for determining whether the evidence of incompetence triggers the defendant's procedural due process right is described as follows: the petitioner must establish that a reasonable judge should have had a bona fide doubt as to his competence at the time of trial. The court views the evidence in the record objectively, from the standpoint of a reasonable judge presiding over petitioner's

case at the time of trial. A petitioner establishes a bona fide doubt if he shows that a reasonable judge should have doubted whether petitioner had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether petitioner had "a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402.

In *Drope*, the Supreme Court stressed that the due process requirement is continuing; a defendant must be competent throughout the entire trial. *See Drope*, 420 U.S. at 171-72, 181; *McGregor*, 248 F.3d at 954. When confronted with a bona fide doubt on competency, the court should "suspend the trial until such an evaluation could be made." *Drope*, 420 U.S. at 181. "If facts are brought to the attention of the court which raise doubts as to the sanity of the defendant, the question of competency *should be determined at that time.*" *State v. Johnson,* 551 N.W.2d 742, 751 (Neb. 1996) (citing *State v. Bolton*, 316 N.W.2d 619 (Neb. 1982)) (emphasis added).

Mr. Trail has a long history of symptoms of mental illness that run throughout his family that include uncontrollable mood fluctuations, cognitive impairments, and reality distortion. Mr. Trail's mental and emotional impairments led to his mid-trial suicide attempt that occurred when he slit his own throat in the courtroom in front of the jury. Although trial counsel requested a mental evaluation of Mr. Trail's competence to proceed based on his mid-trial suicide attempt, the trial court denied it, relying on a pretrial finding that he was competent to proceed at the time of the previous evaluation. But in deferring to a competency finding that

occurred prior to the suicide attempt, the court erroneously relied on an evaluation conducted at a time when trial counsel had done no investigation into Mr. Trail's mental health. *See* Habeas Claim 6. Indeed, at that time, the trial court had yet to provide defense counsel an investigator to develop such relevant evidence.

Moreover, the law recognizes the reality that symptoms of mental illness can wax and wane over time, so the due process obligation of the court to ensure the defendant's competence to stand trial is a continuing one. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 179; *see also Pate*, 383 U.S. 375. Under Nebraska law, "the trial court's failure to hold a full, fair, and adequate hearing" when facts arise suggesting that the defendant is incompetent is "a denial of due process." *Johnson,* 551 N.W. at 758.

Thus, regardless of what the trial court believed prior to trial about the issue of competence, the events at trial should have alerted the trial court to inquire again. The totality of circumstances known to the trial judge, and especially Mr. Trail's in-court suicide attempt, raised a substantial doubt that Mr. Trail possessed "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *McGregor,* 248 F.3d at 954 (quoting *Dusky, 362 U.S.* at 402).

Mr. Trail was represented by the same counsel on direct appeal as he was at trial. Although counsel appealed the trial court's denial of Mr. Trail's motion for a new trial based on his in-court suicide attempt, counsel failed to allege that the trial

61

court erred by denying the request for an updated competency evaluation. This deficient failure prejudiced Mr. Trail.

As noted above, ensuring that a criminal defendant is competent to proceed is a constitutional requirement. Mr. Trail's suicide attempt absolutely establishes a bona fide doubt as to his competence to proceed with the trial. To simply dismiss this extreme behavior as a bid for attention without inquiring further was error. The trial court certainly should have doubted whether Mr. Trail had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether Mr. Trail had "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

By failing to raise this issue on direct appeal, counsel deprived Mr. Trail of the opportunity to have the Nebraska Supreme Court consider the issue of his procedural due process right not to be tried while incompetent. *See Strickland*, 466 U.S. at 688. Had the court been presented with this important issue, there is a reasonable probability it would have ordered a new trial. *See id.* at 694. Mr. Trail's right to the effective assistance of counsel under Sixth and Fourteenth Amendments was thus violated by counsel's failure to raise this issue on direct appeal.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly

before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

On the merits, Mr. Trail was incompetent to stand trial, the trial court deprived him of his procedural due process right by refusing to order a competency evaluation, and his rights under the Sixth and Fourteenth Amendments were violated by counsel's failure to raise this issue on appeal. This Court should grant habeas relief on this ground individually and collectively due to the combination of this error with other trial errors in this petition. *Strickland*, 466 U.S. at 695-96 (explaining that a reviewing court must "consider the totality of the evidence [and] ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."); *see also Drope*, 420 U.S. at 182 (noting the interrelatedness of the competency inquiry and the inquiry regarding a potential waiver of a fundamental right). Therefore, this Court should grant the writ, vacate the conviction and death sentence, and order a new trial after an updated competency evaluation.

> **Claim 8:**   **Mr. Trail was denied the effective assistance of counsel when counsel failed to allege on direct appeal that Mr. Trail's substantive due process right to not be tried while incompetent was violated.**

On June 24, 2019, six days after Mr. Trail's jury trial began, Mr. Trail attempted to kill himself in the courtroom by slashing his throat with a razor blade in front of the jury. This caused him to be absent from most of the remainder of his trial. In addition to that obvious display of Mr. Trail's serious mental health crisis

and suicidality, the post-trial investigation into Mr. Trail's history, background, and characteristics—bare-bones though it was—suggested that he suffered from mental health struggles prior to his in-court suicide attempt.

Mr. Trail's history and his in-court suicide attempt made clear that he suffered a severe mental illness at the time of his trial that rendered him unfit to proceed. As a result of his severe mental illness, he was unable to be an active participant in his defense, he could not manage his emotions or control his behavior during his trial, he was incapable of being present during the proceeding, he could not pay attention to the evidence and consult with counsel during the proceedings, he could not testify in his defense, and did not understand the nature of the charges and proceedings against him.

The trial of a person who is incompetent to proceed offends the Due Process Clause of the Fourteenth Amendment: It is well-settled that the "criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). This "prohibition is fundamental to an adversary system of justice." *Drope*, 420 U.S. at 172. The rule, rooted in the common law, is a "by-product of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." *Id.* at 171; *see also McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001). Therefore, "an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' – the basic fairness of the trial itself." *Cooper*, 517 U.S. at 354, 364.

64

In Mr. Trail's case, a brief competency evaluation was conducted by Dr. Klaus Hartmann during the early stages of Mr. Trail's case. On November 7, 2018, the trial court found Mr. Trail was competent to stand trial based solely on the information contained in a sealed report. *See* 11/08/18 Journal Entry citing to sealed exhibit. Trial counsel did not present any additional evidence. But at the time of the competency evaluation, trial counsel had not yet requested funds for a mitigation specialist or conducted any investigation into Mr. Trail's mental health. Dr. Hartmann did not have any information about Mr. Trail's life and background, let alone complete information that would have been discovered by a reasonable investigation. Therefore, Dr. Hartmann's evaluation was incomplete and his opinion regarding Mr. Trail's competency was unreliable.

An opinion is only as good as the comprehensiveness of the information upon which it is based. And Dr. Hartmann obtained nothing from defense counsel on which to base his opinion.

Additionally, competency is not a stable state impervious to change. It is fluid. Competency is an issue that may be raised at any point during the proceedings. Over seven months elapsed between the trial court's determination that Mr. Trail was competent to proceed and the beginning of his trial. During that time, he remained incarcerated and did not have access to mental health and psychiatric care. At the start of trial, evidence showed that Mr. Trail was already struggling to participate in his defense. On June 19, 2019, the second day of trial, Mr. Trail said he was sick and unable to come to court. Then, most notably, on June

65

24, 2019 (five days later), Mr. Trail slit his own throat with a razor blade during trial and in front of the jury. He was then completely absent from trial. *See* Habeas Claim 3.

This behavior shows that Mr. Trail was unable to manage his emotions and control his own behavior. He was incapable of being present for the majority of the evidence against him, nor could he meaningfully communicate with his counsel. Later, he further demonstrated an inability to be present for proceedings when he waived his appearance at the aggravation/mitigation hearing.

Despite this significant evidence of Mr. Trail's incompetence to stand trial, as well as the trial court's denial of the defense motion for a renewed competency evaluation after Mr. Trail's suicide attempt, defense counsel did not raise the issue of Mr. Trail's incompetence or the court's denial of the requested competency evaluation on direct appeal. Despite appealing the denial Mr. Trail's motion for a new trial based on his in-court suicide attempt, counsel failed to allege that the trial court erred by requiring Mr. Trail's trial to proceed while he was incompetent and denying the request for an updated competency evaluation. This fell below an "objective standard of reasonableness" and prejudiced Mr. Trail, as it precluded the Nebraska Supreme Court from addressing Mr. Trail's competency on direct appeal. *See Strickland*, 466 U.S. at 688. Had the court been presented with this important issue, there is a reasonable probability it would have ordered a new trial. *See id.* at 694. Mr. Trail's right to the effective assistance of counsel under Sixth and

Fourteenth Amendments was thus violated by counsel's failure to raise this issue on direct appeal.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

This Court should grant habeas relief on this ground individually and collectively due to the combination of this error with other trial errors in this petition. *Strickland*, 466 U.S. at 695-96 (explaining that a reviewing court must "consider the totality of the evidence [and] ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."); *see also Drope*, 420 U.S. at182 (noting the interrelatedness of the competency inquiry and the inquiry regarding a potential waiver of a fundamental right). On the merits, Mr. Trail was incompetent to stand trial and his rights were violated by counsel's failure to raise this issue on appeal. Therefore, this Court should grant the writ, vacate the conviction and death sentence and order a new trial after an updated competency evaluation.

**Claim 9:**   **The trial court erred in failing to sever the non-capital conspiracy count from the first-degree murder count.**

Eight months after the original charging information, on March 27, 2019, the State filed an Amended Information adding the charge of Criminal Conspiracy to Commit First Degree Murder (Count III) to the previously charged First Degree Murder (Count I) and Improper Disposal of Human Skeletal Remains (Count II). After such amendment, Mr. Trail filed a motion to sever Counts II and III from Count I of the Amended Information. Refusal to sever allowed the State to introduce improper, irrelevant, and unfairly prejudicial evidence to secure a conviction on the First Degree Murder charge.  In short, with no evidence of premeditation, the State needed to charge conspiracy, which permitted the presentation of hearsay evidence otherwise inadmissible as to Count I.

Nebraska has a liberal severance statute. Neb. Rev. Stat. § 29-2002(3) states, "[i]f it appears that a defendant or the state would be prejudiced by a joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever relief justice requires."  The severance of Counts II and III from Count I was necessary to prevent Mr. Trail from the prejudice that resulted from the counts being tried together.

Counts II and III are not lesser included offenses of Count I. Thus, evidence that is only related to those charges should not have been relevant or admissible as

to first degree murder.  Because of the failure to sever, Mr. Trail was unfairly prejudiced.

In *State v. Hudson*, 775 N.W.2d 428, 436 (Neb. 2009), the court explained the reasoning for the defendant's motion and the danger the defendant was seeking to avoid by stating: "[t]he purpose of requiring independent evidence to establish a conspiracy is to prevent the danger of hearsay evidence being lifted by its own bootstraps, i.e., relying on the hearsay statements to establish the conspiracy, and then using the conspiracy to permit the introduction of what would otherwise be hearsay testimony in evidence."  Indeed, in Mr. Trail's circumstance the failure to sever permitted the State the opportunity to introduce evidence that was only relevant to Counts II and III as impermissible evidence supporting the murder charge.

There must be independent evidence offered to establish a conspiracy under Nebraska law. Nebraska law requires that: "[b]efore the trier of facts may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence." *Hudson*, 775 N.W.2d at 434. Otherwise, the improper "bootstrapping" of proof occurs. *Id.* at 436. Yet at the hearing on this matter held on May 22, 2019, the State acknowledged that their evidence supporting both the murder charge and the conspiracy charge was not at all independent and was, in fact, inextricably intertwined. This violated Nebraska law and mandated severance of the counts.

Instead, the improper "bootstrapping" of proof is precisely what the court's refusal to sever permitted the State to do in Mr. Trail's case.  The State was allowed

to introduce hearsay evidence to establish a conspiracy, with its more flexible hearsay rules, and then utilize that conspiracy evidence to obtain a conviction on the first-degree murder charge.

Prejudice cannot be cured with a limiting instruction under these circumstances. As noted by the United States Supreme Court, limiting instructions are often overlooked by juries: "The naive assumption that prejudicial effect can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453  (1949) (Jackson, J., concurring); *see also Burgett v. Texas*, 389 U.S. 109 (1967). Further, limiting instructions actually can have an exacerbating effect on the error by highlighting it for the jury. *See, e.g., United States v. Sanchez-Garcia*, 685 F.3d 745 (8th Cir. 2012) ("Sanchez-Garcia declined a limiting instruction and deliberately chose to withhold a contemporaneous objection so as to avoid drawing attention to the statement."); *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) ("[A] defendant may choose to go without [a limiting instruction] to avoid highlighting the evidence.").

The Court has acknowledged time and again that "death is a different kind of punishment from any other which may be imposed in this country. . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).  Therefore, rules that "tend to diminish the reliability" of either the guilt or sentencing determination in capital

70

cases violate the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

Here, the State hastily chose to seek the death penalty on Count I, and only after eight months when it became obvious there was no evidence of premeditated murder did they simply add a conspiracy charge to secure a conviction using inadmissible hearsay evidence to circumvent the rules of evidence to prove Count I. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014). In light of the State's bootstrapping of proof of the conspiracy to prove the death-eligible murder count raises a reasonable probability that the improper joinder of counts influenced the jury's verdict as to murder.

The State should not have been allowed to attempt an end-run around the rules of evidence with a manufactured conspiracy charge devised to introduce improper, irrelevant, and unfairly prejudicial evidence to prove the murder charge — yet the trial court allowed the State to do so.  The trial court's refusal to sever the first-degree murder charge violated Mr. Trail's constitutional rights by allowing the State to prove elements not supported by any evidence with normally inadmissible evidence but for a conspiracy charge. Indeed, the first-degree murder charge was the weaker of the two charges due to the utter lack of premeditation evidence—so weak that it would have resulted in a different outcome if tried alone.

The failure to sever taints the conviction obtained against Mr. Trail as to Count I, First-Degree Murder. Because the Nebraska Supreme Court acted contrary

71

to and/or unreasonably applied clearly existing federal law and/or an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(1) and (2), the Court should grant the writ, vacate the conviction as to Count I and the death sentence, and remand for new proceedings in state court.

> **Claim 10:  Mr. Trail's counsel was ineffective for failing to raise on direct appeal the insufficiency of the State's evidence to prove conspiracy, which the State bootstrapped to compensate for its lack of evidence of premeditation, and for failing to raise the insufficiency of the State's evidence to prove the aggravator.**

To prove a defendant's guilt in a criminal case, the State's evidence must be sufficient to prove beyond a reasonable doubt that the defendant committed every element of the charged offense. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970). In Nebraska, a charge of first-degree murder requires the State to prove premeditation. Neb. Rev. Stat. § 28-303.

In Mr. Trail's case, the State lacked evidence of premeditation and so, eight months after the original charging information was filed, the State amended the information to include a charge of conspiracy. As a result, the State was permitted to introduce otherwise inadmissible hearsay evidence related to the alleged conspiracy in order to prove first-degree murder. *See* Habeas Claim 9. But the State's hearsay evidence was insufficient to prove the existence of a conspiracy between Mr. Trail and Ms. Boswell. Rather, the evidence the State adduced to prove the conspiracy did not implicate Mr. Trail in a conspiracy and mostly centered on salacious details surrounding his relationship with Ms. Boswell and his participation in her relationship with other women. This evidence fell short of

72

proving beyond a reasonable doubt that Mr. Trail and Ms. Boswell participated in a conspiracy together to commit murder.

Likewise, Nebraska law requires that the existence of a statutory aggravating circumstance be proved beyond a reasonable doubt for a defendant to be eligible for the death penalty. Neb. Stat. Ann. § 29-2521(2). Here, the State alleged that the murder in this case "manifested exceptional depravity by ordinary standards of morality and intelligence." Neb. Stat. Ann. § 29-2523(1)(d). As the State admitted in its closing brief, this aggravating circumstance "focuses on the state of mind of the killer and may be proven by the conduct and acts of the defendant at or near the time of the murder." Ex. 919, p. 1.

Yet the State had no evidence of Mr. Trail's state of mind, nor did it present evidence of his conduct at or near the time of the murder. Rather, it presented evidence about Ms. Boswell's actions at or near the time of the murder, and alleged that because of the conspiracy, her actions proved Mr. Trail's state of mind. The State's closing brief effectively concedes this: in describing messages Ms. Boswell exchanged with the victim, the State claims, without evidentiary support, that Mr. Trail and Ms. Boswell shared the phone and that "Trail is lurking in the background but is fully engaged." Ex. 919, p. 11. In addition to being unsupported by any evidence, this claim contradicts the evidence and arguments the State made at trial. The State's concession that it lacks evidence of Mr. Trail's state of mind or conduct is even more explicit in its reply brief, in which it makes clear it is relying on the alleged co-conspirator statements to prove Mr. Trail's state of mind. Ex. 921,

p. 4. But without evidence of Mr. Trail's state of mind or his conduct and acts around the time of the crime, which the State did not have, the State's evidence was insufficient to prove the existence of the aggravating circumstance beyond a reasonable doubt.

Counsel moved to dismiss the charges at the end of the State's presentation of evidence on sufficiency of the evidence grounds. Tr. 3621. In trial counsel's closing brief on aggravating and mitigating circumstances, counsel forcefully argued that the State had failed to prove the existence of the aggravator beyond a reasonable doubt because it lacked evidence of Mr. Trail's state of mind or his conduct and acts around the time of the crime. Exs. 920, 922. Yet inexplicably, appellate counsel—the same attorney who represented Mr. Trail at trial—did not raise this issue on appeal. Counsel clearly believed—with reason—it was a strong issue, given their arguments at trial and in the closing brief. There is therefore no conceivable, reasonable tactical basis for counsel to fail to raise the issue on appeal.

This is especially so because had counsel challenged the sufficiency of the evidence as to the conspiracy, Mr. Trail's murder conviction would also necessarily merit vacatur since the State was forced to rely on the conspiracy to prove the murder charge in the absence of evidence of premeditation. Likewise, had counsel raised the insufficiency of the evidence to prove the aggravating circumstance on direct appeal, the aggravator would be vacated, and Mr. Trail would not be eligible for the death penalty. Counsel's failure to raise these meritorious issues on appeal was deficient performance and, given the reasonable probability that raising these

74

issues would have required a new trial for murder and/or rendered Mr. Trail ineligible for the death penalty, counsel's failure prejudiced Mr. Trail *Strickland, 466 U.S. at 694*. Counsel's failure to raise the sufficiency of the evidence on appeal thus deprived Mr. Trail of the effective assistance of counsel as required by the Sixth, Eighth, and Fourteenth Amendments.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

> **Claim 11: Mr. Trail was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial.**

Trial counsel provided ineffective representation throughout Mr. Trail's trial. The right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of adversarial testing." *United States v. Cronic*, 466 U.S. 648, 657 (1985). This process requires counsel in death penalty cases to "make reasonable investigations." *Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 387; *id.* at 393-96 (O'Connor, J., concurring)

("The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," it is a constitutional mandate).

In addition to counsel's failure to conduct an adequate investigation into Mr. Trail's background, history, and characteristics, including his mental health history and possible cognitive impairments, *see* Habeas Claims 5, 6, and 12, counsel failed to comply with his duty to provide effective assistance of counsel by failing to move for a change of venue despite extreme pretrial publicity that reached virtually every prospective juror and made it impossible for Mr. Trail to receive a fair trial. Counsel further failed to comply with this requirement when he failed to object to the courts treatment of Mr. Trail's suicide attempt, and when counsel made prejudicial arguments in opening and closing statements that denigrated Mr. Trail and implied to the jury that counsel believed Mr. Trail to be a liar. Each of these errors, individually and cumulatively, deprived Mr. Trail of the effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. at 668; *Cronic*, 466 U.S. at 657; *see also Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018).

## A.      Failure to move for a change of venue.

The right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, *'indifferent'* jurors." *Irvin v. Dowd*, 366 U.S. 717, 721 (1961) (emphasis added). Furthermore, "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)

76

(*citing Irvin*, 366 U.S. at 717). Here, the disappearance and death of Ms. Loofe received a tremendous amount of media attention, which only continued after Mr. Trail and Ms. Boswell were charged with her murder in Saline County, a small community with a population of less than 15,000 residents. U.S. Census, Saline County, Nebraska, https://www.census.gov/quickfacts/fact/table/salinecountynebraska/PST045223 (last visited Feb. 7, 2024). Even the trial itself was heavily publicized, and the court granted motions for expanded media coverage throughout the case, allowing reporters to video record proceedings. *See* Trial Docket.

Despite the pervasive publicity the crime received in this small community and the resulting community sentiments surrounding Mr. Trail and the case, trial counsel did not move for a change of venue. This was a serious error that deprived Mr. Trail of a fair trial because he was forced to go to trial in a community that had been inundated with reports connecting him to the crime, inevitably depriving him of a panel composed of impartial jurors.

This was made clear during jury selection, when the court acknowledged that "virtually everybody" called for jury service had consumed media about the case. Tr. 357. The comments of prospective jurors 137 and 203 are but few examples of the effect this media coverage had on the community from which the venire was called. Prospective juror 137 informed the court that the information she had seen in the media was "burned into my brain." Tr. 379. Similarly, prospective juror 203—who was not present for juror 137's statement—told the court that information about the

case had been "over and over on the media and on the TV and just got it ingrained in my brain." Tr. 383. Even for those jurors who claimed to be able to set aside what they had seen and heard in the media about the offense and about Mr. Trail, the likelihood that they were affected by the inescapable media, even subconsciously, suggests Mr. Trail could not receive a fair trial without a change of venue.

Due to the pervasive media attention Mr. Trail's case received and its clear impact on the community—and, therefore, on the jury panel—Mr. Trail's counsel was ineffective for failing to move for a change of venue. Counsel's failure deprived Mr. Trail of due process and a fair trial.

## B.   Failure to object to the court's improper treatment of Mr. Trail's suicide attempt.

After Mr. Trail attempted to commit suicide in front of the jury during trial, the court ordered the jury out of the courtroom. In a conference with counsel hours later, the court informed the attorneys that after absenting herself from the courtroom, "I talked to the jury a couple of times to reassure them." Tr. 1498. The court's off-the-record interactions with the jury were improper, *see* Habeas Claim 4, but trial counsel did not lodge an objection to the court's improper contact with the jury outside of counsel's presence and off-the-record.

Later, the court admonished the jury not to consider Mr. Trail's "outburst" and individually questioned each juror about whether his suicide attempt would affect their ability to serve as jurors. Tr. 1507-23. The court failed to give counsel an opportunity to question the jurors. In arguing for a mistrial, trial counsel pointed out that the jurors' responses to the court that witnessing Mr. Trail's suicide

attempt would not affect their ability to be fair was not honest. Tr. 1524-25. Rather, given the fact that the court had just instructed the jurors not to consider the suicide attempt and then brought them into chambers individually to ask, "basically, will you follow what I just told you," none of the jurors would feel comfortable saying, "no, Judge, I won't." Tr. 1524.

Counsel pointed out, "I think they have respect for your position, your robes, and the entire process. They feel compelled to answer that way, and I am not sure you got an honest response." Tr. 1524-25. Despite being aware of the likelihood the jurors did not answer honestly due to the court's position and manner of questioning, inexplicably, counsel did not ask to be permitted to voir dire the jurors or object to the court's failure to allow each side to conduct voir dire.

When the court addressed the jury within hours after Mr. Trail's suicide attempt—while he was still in the hospital, sedated and receiving stitches—the court informed the jury, "Mr. Trail is currently in custody." Tr. 1507. The court went on to tell the jury, "I am going to order that Mr. Trail appear in handcuffs for the balance of the trial for obvious reasons. He is not here today at my instruction." Tr. 1508. This was misleading, designed to make it appear that Mr. Trail's injuries were minor—Mr. Trail was in the hospital and could not be present in the courtroom. Tr. 1498-99. Yet counsel did not object to the court's prejudicial statements.

Moreover, the court improperly and preemptively determined that Mr. Trail would appear in shackles for the remainder of the trial without conducting an

79

inquiry into the propriety of such a decision. But counsel did not object to the court's statements or to the court's improper and preemptive decision to shackle Mr. Trail for the remainder of trial and did not request an opportunity to be heard on the issue. When Mr. Trail returned to court on July 9, 2019, more than two weeks after his suicide attempt, the court informed him that he would be "restrained for the balance of this trial." Tr. 3582. When the jury entered the courtroom, the court likewise informed it that "Mr. Trail has decided to appear here today. He has been restrained due to his behavior of two weeks ago." Tr. 3582.

Again, counsel failed to object to the court's statements to the jury or its requirement that Mr. Trail be shackled for the remainder of the trial and did not request that the court conduct a proper inquiry into the State's interest in shackling Mr. Trail such that his due process right against being visibly restrained in front of the jury could be overcome. *See Deck v. Missouri*, 544 U.S. 622, 629 (2005) ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process.").

In the aftermath of Mr. Trail's in-court suicide attempt, the court's improper contact with the jury, its failure to permit counsel to voir dire the jurors, its misleading statements to the jury implying that Mr. Trail's injuries were minor, and its ruling that he be shackled for the remainder of trial without engaging in any process or proper inquiry into the necessity of that action, deprived Mr. Trail of due process and a fair trial in violation of his rights under the Fifth and Fourteenth Amendments. Trial counsel's failure to object to these prejudicial actions and

80

statements by the court violated Mr. Trail's right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.

## C.    Abdication of duty to advocate for client.

The Supreme Court has made clear that "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" *Cronic*, 466 U.S. at 656 (citing *Anders v. California*, 386 U.S. 738, 743 (1967). Mr. Trail's trial counsel's repeated statements denigrating Mr. Trail, as well as counsel's failure to make any opening statement or argument as to mitigation during the penalty hearing, deprived Mr. Trail of an advocate before the jury or the sentencing panel.

During jury selection, opening statements, and closing arguments during the culpability phase, trial counsel repeatedly denigrated and maligned Mr. Trail before the jury. In jury selection, counsel began his questioning of the jury by informing the prospective jurors that "Aubrey Trail is not a nice guy." Tr. 628. Later, in opening statements, counsel told the jurors that Mr. Trail "is not a particularly nice man." Tr. 815. Counsel reiterated this sentiment repeatedly during closing arguments, beginning by telling the jury, "I represent Aubrey Trail . . . But I was also upfront with you about another thing. I don't particularly like him." Tr. 4032-33. Counsel ended his argument by reinforcing this, reminding the jury, "You don't like him, and I don't like him." Tr. 4066.

Counsel also conveyed to the jury that he believed Mr. Trail was a liar—an especially damaging message given that Mr. Trail had testified in his own defense. Counsel informed the jury, "Yesterday Aubrey Trail took the stand. And did he

81

change his story? Yes. Did I expect it? Every one of you knows I didn't. No. Was I upset? Yeah. Oh, call it what it is. I was pissed." Tr. 4052-53. Counsel also told the jury he had been "blindsided" by Mr. Trail's testimony, and, referring to facts counsel had alleged in his opening statement, counsel quipped, "Well, we all found out at the same time that that didn't happen." Tr. 4052-53.

These comments were wholly inappropriate and prejudicial to Mr. Trail. By repeatedly reiterating how much counsel—and the jury—disliked Mr. Trail, counsel denigrated his client and abdicated his role as Mr. Trail's advocate, instead feeding into the negative community sentiment he perceived the jury shared—also reinforcing counsel's ineffectiveness for failing to move for a change of venue. Moreover, by telling the jury he had been "blindsided" and "pissed" because Mr. Trail changed his trial testimony, counsel signaled to the jury that Mr. Trail had lied to counsel about what his testimony would be. This clearly conveyed to the jury that counsel believed Mr. Trail to be a liar, completely undercutting Mr. Trail's credibility and all but ensuring the jury would not find his testimony believable.

At the penalty phase, counsel's failure to advocate for his client was even more evident, as counsel did not present any evidence to rebut the State's aggravation presentation, did not give an opening statement as to mitigation, and made no in-person argument whatsoever before the sentencing panel that was convened to decide whether Mr. Trail would live or die. Counsel called no witnesses and made no oral pleas for Mr. Trail's life. When the court asked for closing argument, counsel requested a briefing schedule instead. Tr. 4424-25. The entire

mitigation presentation by the defense spans only one full transcript page and consisted entirely of counsel's submission of incomplete, internal, privileged documents prepared as part of a preliminary mitigation investigation that was never completed, *see* Habeas Claim 5, a written argument and reply brief, and nothing more. This fell far short of trial counsel's duty to present Mr. Trail's history, background, and characteristics to the sentencing panel, and completely removed any possible human element from the panel's decision. Rather than presenting Mr. Trail as a human being, he was presented merely as words on paper—a far cry from counsel's duty to present the sentencer with evidence and arguments to support a sentence less than death. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

This issue has not been currently presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court.

These and the many additional instances of ineffective assistance of counsel throughout Mr. Trail's trial and sentencing violated his right to effective representation and a fair trial under the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. at 668; *Cronic*, 466 U.S. at 657; *see also Baer*,

879 F.3d at 782-88. The writ should issue, and this Court should therefore order a new trial and sentencing.

> **Claim 12:** **Mr. Trail's right to the effective assistance of trial counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution was violated by trial counsel's failure to competently investigate and present evidence of Mr. Trail's available mental health defenses, including diminished mental capacity.**

Despite red flags indicating Mr. Trail suffered from severe mental illness, which may have included the time of the offense, trial counsel did not conduct a pretrial investigation into Mr. Trail's mental health or consult with relevant mental health experts. This prevented trial counsel from being able to raise available defenses to the first-degree murder and conspiracy charges, including diminished capacity and other potentially relevant mental health defenses. Given trial counsel's failure to investigate Mr. Trail's mental health at the time of the offense, the jury was not presented with evidence that could have led it to acquit Mr. Trail of first-degree murder or find him guilty of a lesser offense.

Trial counsel is duty-bound to investigate relevant defenses to prepare for trial. *Strickland*, 466 U.S. at 690-91 (counsel's duty is to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). For mental health defenses, counsel cannot ignore "abundant signs" of mental illness, *Seidel v. Merkle,* 146 F.3d 750, 755 (9th Cir.1998), or rest only on a "preliminary examination," *Daniels v. Woodford,* 428

F.3d 1181, 1203–04 (9th Cir.2005). Yet that is precisely what Mr. Trail's trial counsel did.

Counsel was aware that Mr. Trail exhibited signs of mental illness. On September 21, 2018, counsel moved for a psychological evaluation to determine whether Mr. Trail was competent to stand trial. 9/21/18 Mtn. for Competency Eval. Counsel had a good-faith basis to believe such an evaluation was needed, and the court granted the request for an evaluation, although Mr. Trail was later found competent to stand trial. 9/25/18 Order for Competency Eval. On November 28, 2018, counsel requested funding to hire a mitigation investigator. 11/28/18 Mtn. for Expert Witness Re: Mitigation Investigator. In that motion, counsel noted:

> Mr. Trail also has a constitutional right to present and argue a complete defense, as protected by the Sixth and Fourteenth Amendments as well as the corresponding sections of the Nebraska constitution. See, e.g.. *Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." [internal quotation marks and citations omitted]).

*Id.* at p. 3.

The court set the motion for a hearing on December 5, 2018, but the hearing was cancelled after the court was "advised by counsel that the Defendant's Motion for Expert Witness Re: Mitigation Investigator will be continued until further order." 11/29/18 Order. The court did not ultimately grant defense counsel's motion for a mitigation investigator until months **after** the guilt phase of the trial ended, in September 2019. 9/26/19 Order.

Despite counsel's acknowledgement that a mitigation investigation would assist Mr. Trail in presenting a complete defense, the record reflects that counsel failed to pursue this motion or press the court for funding before Mr. Trail's guilt phase trial. There is no record of counsel objecting to the court's continuance of the motion, and in fact, the court's November 29, 2018, order suggests that defense counsel may have actually asked for the continuance. Given counsel's early recognition that Mr. Trail's mental health was likely to be an issue, there can be no reasonable basis for counsel's failure to pursue any investigation into his mental health whatsoever before trial.

Had trial counsel conducted a proper and timely investigation into Mr. Trail's background and history, including his mental health at the time of the offense, counsel would likely have been able to present a mental health defense, such as diminished capacity, during the culpability phase of Mr. Trail's trial. Had counsel presented such a defense, there is a reasonable probability the jury would have acquitted Mr. Trail of first-degree murder or found him guilty of a lesser offense. *See Strickland*, 466 U.S. at 694. Counsel's failure to investigate relevant defenses violated Mr. Trail's right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel.

86

*Maples*, 565 U.S. 266, 281. Should the state assert this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, trial counsels' ineffectiveness prejudiced Mr. Trail. Thus, the court should grant Mr. Trail a new trial, which comparts with the Constitution.

> **Claim 13:** **Mr. Trail's right to the effective assistance of counsel was violated when counsel failed to raise a challenge that Mr. Trail's Due Process and Confrontation rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the sentencing judges' consideration of a Pre-Sentencing Investigation Report that included victim opinion evidence.**

The Constitution instills guardrails and procedures regarding the proper consideration of evidence in a capital sentencing proceeding. A defendant must be afforded the opportunity to be heard and the opportunity to rebut the evidence upon which a sentencing court may rely in imposing death. The operation of the Nebraska Death Penalty Statute requiring consideration of a Pre-Sentence Investigation report to which a defendant cannot respond runs afoul of these principles. Trial counsel was ineffective for failing to challenge this process.

Sections 29-2261(1), 29-2521(3) and 29-2522(1) of the Nebraska Revised Statutes, as currently interpreted by the Nebraska Supreme Court, violate Mr. Trail's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Nebraska's sentencing laws require a three-judge sentencing panel composed of two non-presiding judges to fix a sentence for capital defendants by, *inter alia,* determining "[w]hether the aggravating circumstances as

87

determined to exist justify imposition of a sentence of death." R.R.S. Neb. §§ 29-2522(1), 29-2521(3).

However, this permits the sentencing panel to "determine" which aggravating circumstances exist based in part on unconfronted hearsay evidence contained in the presentence investigation report, in violation of the constitution. *See Gardner v. Florida,* 430 U.S. 349 (1977). "Due process . . . requires that [a defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own" when a sentencing proceeding, or portion thereof, constitutes a "new charge leading to magnified criminal punishment. . . in an enhanced sentence proceeding." *Specht v. Patterson*, 386 U.S. 605, 608-11 (1967).

By allowing the sentencing panel to consider evidence of aggravating circumstances or the factual bases of aggravating circumstances contained in the presentence investigation report, Nebraska sentencing laws currently allow the sentencing panel to find essential facts relating to a "new charge leading to magnified criminal punishment," but deny capital defendants their due process rights to be present, to be heard, to confront witnesses against them, and to offer evidence. *See Specht*, 386 U.S. at 605; *Gardner*, 430 U.S. at 349.

Alarmingly, the PSI obviously included improper opinion evidence as to the appropriate sentence for Mr. Trail. *See* Sentencing Order, p. 3 (Referencing opinion evidence). This is improper, and the rung bell cannot be unrung.

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Court held that it is constitutional error to present victim impact and opinion evidence. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court lifted the bar on victim impact evidence — but left in place the constitutional prohibition of victim opinion evidence. *Id.* at 830 n.2; *Williams v. Norris*, 612 F.3d 941, 951 (8thCir. 2010) (recognizing that the Court "left intact the prohibition against statements about 'the crime, the defendant, and the appropriate sentence'; such statements violated the Eighth Amendment and were inadmissible."); *see also Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999) ("family members of the victim may not state 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' at the penalty phase" (quoting *Payne*, 501 U.S. at 830 n.2)).

Informing the sentencer as to the sentencing desires of the victims' family is unconstitutional and not tolerated by the Supreme Court. *Bosse v. Oklahoma*, 580 U.S. 1 (2016). Despite the sentencing panel's statement that it would not consider the victim's family's "characterizations and opinions about the crime, the Defendant, or the appropriate sentence to be imposed," the presentation of such evidence to the sentencing panel was improper under *Payne* and constituted a rung bell that could not be unrung. The introduction of the PSI at sentencing thus violated Mr. Trail's rights to due process, to confrontation, and to a fair sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and Mr. Trail's counsel were ineffective for failing to object to that improper evidence.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this Court should grant the writ and order a new sentencing proceeding to be held in compliance with the Constitution.

**Claim 14:   Trial counsel's failure to negotiate and secure consideration for Mr. Trail's guilty plea to Count II violated Mr. Trail's right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.**

Defense counsel bears the responsibility for advising the defendant of his right not to incriminate himself and the strategic implications of waiving that right. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, (1938). If counsel believes that it would be unwise for the defendant to surrender his privilege, counsel should advise the client in the strongest possible terms to remain silent and not to incriminate himself.

As the Supreme Court has made clear, "the right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the

crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). When counsel fails to adequately advise a client against incriminating himself, including advising a client to plead guilty without attempting to obtain any benefit to the client, counsel has failed in his duty to subject the prosecution's case to meaningful adversarial testing and renders ineffective assistance of counsel pursuant to the Sixth and Fourteenth Amendments.

When an individual enters a guilty plea upon the advice of counsel, the voluntariness of that plea "depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Advice by trial counsel to plead guilty without attempting to negotiate any concessions from the prosecution constitutes unreasonable and deficient advice. This is particularly so in the circumstances of Mr. Trail's case. Here, Mr. Trail pleaded guilty to Count II, improper disposal of human remains, on June 17, 2019, at the outset of his jury trial. The prosecution clearly informed the court that Mr. Trail's guilty plea was not part of any plea agreement. Tr. 328.

After Mr. Trail's plea, the defense asked the court's permission to inform the jury of the facts underlying that offense, which the court granted after a brief colloquy with Mr. Trail. Tr. 341-43. The State then moved *in limine* to preclude the jury from hearing that Mr. Trail had pleaded guilty to Count II, and defense counsel did not object to the prosecution's request. Tr. 343-45. In light of this sequence of events and the defense theory in the case, there could be no benefit to Mr. Trail's pleading guilty

91

to Count II without the jury being permitted to know about the plea, and counsel was ineffective for advising Mr. Trail to enter a guilty plea without receiving any consideration.

Even if counsel believed that Mr. Trail's admission to having dismembered Ms. Loofe's body after she accidentally died would support their overall defense theory, there was no reason for Mr. Trail to plead guilty to that offense before trial without consideration from the State. Counsel could not have believed the fact of his pleading guilty would ingratiate Mr. Trail in the eyes of the jury, because counsel did not even oppose the state's motion to preclude the jury from hearing that Mr. Trail pleaded guilty. Counsel stated that they intended to indicate to the jury that Mr. Trail admitted his responsibility to the underlying facts of the improper disposal charge, but that they did not "see an issue" with refraining from informing the jury that he pleaded guilty. Tr. 344.

There is no reason counsel could not have pursued that defense theory without Mr. Trail's guilty plea to Count II. Mr. Trail could have—and did—testified that he dismembered the victim's body in a panic after she accidentally died, without first pleading guilty to that charge. On the other hand, if counsel truly believed there was something to be gained by Mr. Trail's pleading guilty to Count II, counsel would have attempted to negotiate with the state to provide some consideration in exchange for that plea. At the very least, counsel would have objected to the state's motion to preclude the jury from being informed of the plea.

Had the jury been informed that Mr. Trail pleaded guilty to Count II in

conjunction with Mr. Trail's testimony that he disposed of the body in a panic after the accidental death, it would have lent significant credibility to Mr. Trail's testimony. But Mr. Trail's guilty plea was meaningless at trial if the jury was not even permitted to know about it. Counsel's decision to pursue a blind plea without any consideration and without negotiating to allow the jury to hear about it could not possibly have been the result of a reasonable strategic decision because it did not support counsel's defense strategy.

Moreover, given the first-degree murder charge and potential death sentence Mr. Trail was facing, it strains reason to believe counsel thought pleading guilty to Count II would ultimately assist Mr. Trail before the sentencing panel. Indeed, counsel did not even argue in its briefing after the mitigation presentation that the sentencing panel should consider Mr. Trail's guilty plea as a mitigating circumstance. *See* Exs. 920, 922. There was, therefore, no conceivable benefit to Mr. Trail for his guilty plea, either during the guilt phase of his trial or at sentencing.

By allowing Mr. Trail to enter a blind plea to improper disposal of human remains with no consideration, without the jury being permitted to know he had accepted responsibility for that offense, and still face capital murder with no benefit, counsel abdicated his duty to Mr. Trail and failed to subject the state's case to meaningful adversarial testing. *Cronic*, 466 U.S. at 656; *Hill*, 474 U.S. at 56. Counsel's performance fell "below an objective standard of reasonableness" and prejudiced Mr. Trail, who began his jury trial having already pled guilty to a key charge that ultimately and unnecessarily helped to prove the state's case for first-degree murder

93

and subject him to a death sentence. *Strickland*, 466 U.S. at 688, 694. Mr. Trail's right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments was violated by counsel's unreasonable performance.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maple*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this court should grant the writ and order a new trial on Count II.

> **Claim 15:  Mr. Trail's guilty plea to Count II was taken in violation of his right to due process of law, and counsel was ineffective for failing to raise this violation on direct appeal.**

As demonstrated by the evidence of Mr. Trail's longstanding history of mental illness, culminating in his attempted suicide in court on the sixth day of his trial during which he slashed his throat with a razor in front of the jury, Mr. Trail was unable to be an active participant in his defense. He could not manage his emotions or control his behavior during his trial, he was incapable of being present during the proceedings, he could not pay attention to the evidence and consult with counsel during the proceedings, he could not competently testify in his defense, and did not understand the nature of the charges and proceedings against him. Under

these circumstances, Mr. Trail's guilty plea was not knowing, voluntary, and intelligent and was taken in violation of his right to due process under the Fifth and Fourteenth Amendments.

Mr. Trail's plea of guilty fell short of the prosecutor's obligation to establish that it was entered knowingly, voluntarily, and intelligently. "The requirement that the prosecution spread on the record the prerequisites of a valid waiver is no constitutional innovation." *Boykin v. Alabama,* 395 U.S. 238, 242 (1969). The Supreme Court explained that "Presuming waiver from a silent record is impermissible." *Id.* (quoting *Carnley v. Cochran,* 369 U.S. 506, 516 (1962)).  The record must affirmatively show an intelligent and understanding waiver of any constitutional right; "[a]nything less is not waiver." *Id.* Although *Carnley* involved the waiver of counsel, the *Boykin* Court stated:

> We think that the same standard must be applied to determining whether a guilty plea is voluntarily made.  For, as we have said, a plea of guilty is more than an admission of conduct; it is a conviction. Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality.  The question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards.

*Boykin*, 395 U.S. at 242. Where human life is at stake, the law requires a far more searching inquiry than what occurred in Mr. Trail's case. "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Id.* at 243-44.

The plea colloquy in Mr. Trail's case falls far short of these constitutional mandates. It comprises barely seventeen pages of transcript during which Mr. Trail said only 61 words, over half of which were "yes" or "no" in response to leading questions (31 words), "your honor," (8 words), and the remaining amounted to his name, age, last grade of school completed, and a response to a question about his heart medication. There was not one open-ended question asking him to state his understanding of the consequences of his plea, or his reasons for changing his plea. No questions were asked about his understanding of the elements of the charge. No questions were asked about possible defenses, and the only question about his mental state, "Have you ever been given a diagnosis from a doctor, a psychiatrist, or a psychologist regarding your ability to understand what is going on here this morning?" produced a misleading, "No." Tr. 332.

Given Mr. Trail's history of trauma and mental health symptoms, this one-size-fits-all colloquy was inadequate to explore his understanding of the charges, the range of punishment to which he could be sentenced, the state's obligation to prove his culpable *mens rea* beyond a reasonable doubt, the availability of partial defenses that might result in a conviction for a lesser offense, or his understanding of the contrasting and sometimes confusing roles of juries and judges in capital sentencing under Nebraska law. Mr. Trail was on trial for his life, and the court used the same script it would have used in any other case to inquire about his understanding. And while the charge to which Mr. Trail pled guilty did not itself carry a potential death sentence, pleading guilty to that charge at the outset of trial,

with no consideration from the State and without being permitted to inform the jury

of the plea, had serious implications on the jury's verdict as to the first-degree

murder count and the death sentence. *See* Habeas Claim 14.

The deficiencies in Mr. Trail's plea colloquy are comparable to the colloquy

the Eighth Circuit found to be inadequate in *Wilkins v. Bowersox,* 145 F.3d 1006

(8th Cir. 1998). There, the court observed:

> Initially, we note that the state trial courts inquiry to determine the
> validity of Wilkins' waiver of his right to counsel was not the kind of
> "penetrating and comprehensive examination" required to ensure that
> an accused's waiver of counsel is valid. The court's colloquy with Wilkins
> regarding his decision to waive counsel consisted predominantly of
> leading questions that failed to allow Wilkins to articulate his reasoning
> process. While Wilkins' simple "yes" and "no" answers indicated an
> intention to waive his right to counsel, this does not conclusively
> establish that his waiver of counsel was valid. A judge has an obligation
> to penetrate the surface with a more probing inquiry to determine if the
> waiver is made knowingly, intelligently, and voluntarily. Wilkins did,
> however, make it very clear to the trial court that the only attorney he
> would even consider taking was one who would do everything he could
> to clear Wilkins' path to the gas chamber.

*Id.* at 1012 (citing *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)) (internal citations

omitted).

The court also noted assurances by Wilkins's counsel that he had explained

his rights and his defenses to him was not adequate to establish that Wilkins

*understood* the charges, his rights, his possible defenses, and the consequences of

his plea. Nor did the inquiry disclose Wilkins's motives for his plea or account for

the fact "that a defendant's background and personal characteristics are highly

relevant in determining the validity of such a waiver." *Wilkins,* 145 F.3d at 1012.

97

Importantly, the Eighth Circuit in *Wilkins* also rejected the state's contention that a defendant's "mental condition and other personal characteristics are not relevant to a determination of voluntariness," making clear that, in fact, "the mental health of a defendant is . . . a relevant consideration in assessing whether a waiver . . . was knowing, intelligent, and voluntary." *Id.* While the *Wilkins* court considered the defendant's mental health in assessing the voluntariness of his waiver of counsel, the Supreme Court has made clear that same knowing, intelligent, and voluntariness standard applies to the guilty plea context. *Boykin*, 395 U.S. at 242.

The court in Mr. Trail's case wholly failed to account for Mr. Trail's compromised mental health, cognitive limitations, deficient academic performance history, the complexity of the charges and possible defenses, his physical illnesses and disabilities that were giving him problems in the jail, *see* Tr. 321-23, and other internal characteristics, pressures, and limitations, in determining whether his plea of guilty and waiver of right to trial by jury were knowing, voluntary and intelligent. In *Wilkins,* the court found:

> In the present case, while the state trial court briefly addressed Wilkins' youth and limited educational background, the court took no account of Wilkins' upbringing. The record is uncontroverted that Wilkins was severely abused as a child by his mother and her boyfriends, that he had a history of drug abuse, and that by the age of 10, he had been in and out of mental health facilities and had been described as having demonstrated homicidal and suicidal tendencies. Given the combination of Wilkins' young age and the record evidence of his severely troubled childhood, the state trial court's colloquy with Wilkins was far from the kind of in-depth inquiry that is necessary to ensure a valid waiver of counsel.

*Wilkins,* 145 F.3d at 1012-13.

The inquiry in Mr. Trail's case was even less probing and yielded misleading responses about Mr. Trail's mental health history that trial counsel did not correct. His upbringing, trauma history, cognitive and mental health impairments are no less disabling than those experienced by Mr. Wilkins. Indeed, Mr. Trail tried to kill himself in front of the jury only seven days after his guilty plea. This demonstrates that, contrary to the court's findings that his plea was made knowingly, intelligently, and voluntarily, he was in a severe mental health crisis. The evidence of Mr. Trail's severe mental illness, which was acute at the time of his guilty plea, refutes any suggestion that his guilty plea was made knowingly, intelligently, and voluntarily. In light of the evidence to the contrary, Mr. Trail's guilty plea to Count II was taken in violation of his right to due process under the Fifth and Fourteenth Amendments and must be vacated.

Additionally, counsel was ineffective for failing to raise the involuntary nature of Mr. Trail's guilty plea on appeal. Contrary to trial counsel's claim during Mr. Trail's plea colloquy that Mr. Trail made the decision to plead guilty to Count II voluntarily, just seven days after that guilty plea, Mr. Trail tried to kill himself in the courtroom by slashing his throat in front of the jury. Counsel moved for a mistrial and, later, a new trial as a result of this highly prejudicial incident; counsel also moved for a second competency hearing. Despite recognizing that Mr. Trail's in-court suicide attempt indicated he was experiencing a serious mental health crisis and placed his competency in question, counsel did not raise on direct appeal the

issue of Mr. Trail's lack of ability to enter a knowing, voluntary, and intelligent guilty plea only days before he tried to kill himself. In failing to raise this issue on direct appeal, counsel's performance was deficient. *Strickland*, 466 U.S. at 688.

Trial counsel's deficient performance throughout trial and on direct appeal more broadly sheds additional light on this issue. Trial counsel did not follow up on specific avenues of investigation identified by the mitigation specialist who conducted a preliminary, incomplete investigation into Mr. Trail's background and mental health. Likewise, even when faced with obvious and gruesome evidence of Mr. Trail's mental illness and suicidality, counsel failed to adequately protect Mr. Trail's due process rights. Mr. Trail's suicide attempt, along with the evidence of longstanding mental illness uncovered by CLS Mitigation—on which counsel failed to follow up—put counsel on ample notice that Mr. Trail's competency and the voluntariness of his actions in the days surrounding the suicide attempt, including at the time of his guilty plea, were dubious. Had counsel raised this issue on appeal, the Nebraska Supreme Court likely would have determined that Mr. Trail's plea was not taken in accordance with his due process rights and would have vacated his conviction to Count II. Counsel's failure prejudiced him in violation of his right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the

ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maple*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this court should grant the writ and order a new trial on Count II.

> **Claim 16:  Mr. Trail's Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's failure to grant a continuance and appellate counsel were ineffective in failing to raise the denial as an appellate issue.**

The trial court pushed the sentencing forward during the middle of the Covid-19 pandemic. Mr. Trail filed a motion requesting a continuance and listed the family members and testimony that would be impacted by the failure to permit the extension.  Specifically, trial counsel noted the following critical family members would be prevented from appearing in court during the pandemic:

- Tony Trail; Adoptive father to Defendant; Manchester, Tennessee.
- Robert Trail; Older brother of Defendant; Manchester, Tennessee.
- Walter Shelton; Paternal Uncle to Defendant; Wartrace, Tennessee.
- Joyce Harris Frye; Mother of Defendant; Manchester, Tennessee.
- Maranda Ford; Friend of Defendant; Lucedale, Mississippi.

Based on restrictions resulting from the current pandemic it would be impossible to attempt to subpoena any out of state witnesses in the short time before the currently scheduled hearing and the failure to secure these witnesses may constitute ineffective assistance of counsel.

12/04/20 Motion to Continue, p. 1.

The continuance motion detailed other factors that interfered with their ability to act as effective counsel.  Mr. Trail documented how the restrictions to

meet in person with his counsel as well as the inability to have confidential phone calls impaired the attorney client relationship and the development of mitigation. *Id.* at p. 3-4.

When the motion was filed, in December 2020, the pandemic was surging. Public health should have been a concern and a basis to grant a continuance to ensure the attendance of Mr. Trail's witnesses and the fairness of the proceedings.

As noted in Mr. Trail's motion for a continuance, he was entitled to sufficient time to allow his counsel to adequately prepare for sentencing. *Powell v. Alabama,* 287 U.S. 45, 59 (1032) ("[A] defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense[.]"); *see also United States v. Ash*, 413 U.S. 300, 340-41 (1973). Mr. Trail has a right to present a mitigation defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Mr. Trail's counsel indicated they could not present evidence in support of mitigation without a continuance, and indeed, they did not present a single witness.

The right to effective assistance of counsel entails the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. *United States v. Cronic,* 466 U.S. 648, 656 (1984). Under some circumstances, the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair. *Id.* (citation omitted). When surrounding circumstances justify a presumption of ineffectiveness, a Sixth Amendment claim is sufficiently proved without inquiry into counsel's

102

actual performance at trial. *Cronic,* 466 U.S. at 662. The set of facts surrounding the trial court's denial of a continuance justifies a presumption of prejudice in this case. The trial court's insistence on commencing the sentencing proceeding in the height of a global pandemic forced Mr. Trail to proceed even though his attorneys affirmed their ineffectiveness if forced to do so. *Cf. United States v. Sellers*, 645 F.3d 830 (7th Cir. 2011) (denial of continuance constituted denial of counsel of choice, warranting reversal without inquiry into prejudice).

Additionally, a request for a continuance is but a means to the end of a fair trial. The constitutional right to counsel would be worthless unless reasonable time were allowed counsel to familiarize himself with the case and to prepare the defense. As the Supreme Court instructs, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite,* 376 U.S. 575, 588-91 (1964). A defendant must be given adequate time to review the state's evidence so as not to adversely affect the defense's ability to respond. Indeed, a reasonable time for adequate preparation of the defense is the first essential of trial fairness. *Ungar*, 376 U.S. at 588-91; *see also United States v. Ploeger*, 428 F.2d 1204, 1205-06 (6th Cir. 1970).

According to the Supreme Court, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar*, 376 U.S. at 589. Indeed, the erroneous denial

103

of a continuance may violate defendant's Sixth Amendment right to counsel, and his

Fifth, Sixth and Fourteenth Amendment rights to present a defense. *See Gardner v.*

*Barnett*, 175 F.3d 580 (7th Cir. 1999); *United States v. Gallo*, 763 F.2d 1504  (6th

Cir. 1985); *Bennett v. Scroggy*, 793 F. 2d 772 (6th Cir. 1986).

A trial court's failure to grant a continuance to enable a defendant to exercise

his constitutionally protected right to offer the testimony of witnesses and to compel

their attendance may, in some circumstances, constitute a denial of due process. *See*

*Bennett*, 793 F.2d at 774. "When a denial of a continuance forms a basis of a petition

for a writ of habeas corpus, not only must there have been an abuse of discretion

but it must have been so arbitrary and fundamentally unfair that it violates

constitutional principles of due process." *Id*.  "There must also be some showing that

granting the continuance would have furthered the court's attempt to secure a just

determination of the cause." *Bennett*, 793 F.2d at 775.

In this case, Mr. Trail's request for delay was due to a global pandemic which,

at the time of the request, was causing serious illness and death around the

country. At the time of Mr. Trail's continuance motion, the seven-day average of

dead Nebraskans due to Covid-19 was 26.9 per day, with 1.4 deaths per 100,000

people. Covid ActNow, Nebraska, https://covidactnow.org/us/nebraska-

ne/?s=49123657 (last visited 2/6/24). The day the motion was filed, the seven-day

average of hospitalizations in Nebraska was 909.4. Covid ActNow, Nebraska,

https://covidactnow.org/us/nebraska-ne/?s=49123657 (last visited 2/6/24). Finally,

because Nebraska's death penalty scheme deprived Mr. Trail of a jury sentencing,

*see* Habeas Claim 22, *infra*, it would have been extremely easy to provide a continuance without taxing the community and the process.

The Eighth and Fourteenth Amendments require the sentencer to consider as a mitigating factor "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The failure to grant a continuance in order to allow Mr. Trail to present mitigating evidence, which the sentencing panel was required to consider, rendered the sentencing trial fundamentally unfair and had a substantial and injurious effect or influence upon the proceedings because it specifically prevented Mr. Trail's family from testifying. Indeed, no witnesses appeared on Mr. Trail's behalf.

A trial court's denial of a continuance rises to the level of a constitutional violation only where there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar*, 376 U.S. at 589). To obtain habeas relief, it is not sufficient for the petitioner to show that the trial court arbitrarily denied the continuance request; he "must also show that the denial of a continuance actually prejudiced his ... defense." *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004). "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise [would have benefited] the defense." *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

In Mr. Trail's case, the extenuating circumstances of a global pandemic rendered him unable to present a single witness to testify in the mitigation hearing. Mr. Trail's continuance motion made clear that denying a continuance would likely cause this very result and demonstrated that there were a number of witnesses who would have been available to testify at the hearing had a meaningful continuance been granted. As a result of the dearth of mitigation witnesses on Mr. Trail's behalf, the sentencing panel gave little weight to the non-statutory mitigating circumstance caused by Mr. Trail's traumatic and challenging upbringing. *See* Sentencing Order. Had the panel heard witness testimony about those circumstances, there is a reasonable probability the panel would have given greater weight to that mitigating circumstance and found other mitigating circumstances as well. Given the single aggravating factor, an adequate mitigation presentation would likely have impacted the balance of aggravating and mitigating evidence and resulted in a life sentence.

In conclusion, the trial court's denial of Mr. Trail's reasonable request for a continuance to prepare a defense and produce mitigating evidence violated his rights to counsel, of confrontation, to secure the attendance of witnesses, to fair and rational capital sentencing, and to due process of law, under the Sixth, Eighth, and Fourteenth Amendments.  Appellate counsel were ineffective in failing to raise this meritorious claim.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the

ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maple*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 1566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this Court should grant habeas relief and order that Mr. Trail receive a new penalty proceeding.

> **Claim 17:** **The trial court erred in "death qualifying," but not "life qualifying", a jury that did not as a matter of law need to be death qualified because the jury does not make the sentencing determination.**

Mr. Trail filed a motion to prevent death qualification of the jury panel because it violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. The trial court denied that request. As a result, the jury was death qualified, but was not also life qualified.

Mr. Trail unsuccessfully tried to prevent any mention of a possible death sentence he might receive. Instead, the jury was inundated with the possibility of death — a reality only in the event of a conviction — via the jury questionnaires, the voir dire process and the arguments of counsel. Death qualification was wholly unnecessary in this case, because in Nebraska, a jury will never determine the sentence in a capital case. However, all studies indicate that death qualification leads to a conviction-prone jury.

Death qualification is not required by Nebraska law, thus sentencing considerations need not even be mentioned during voir dire. The problems death-qualification creates can be entirely avoided by **never** informing the jury of

potential sentencing options in the event of a conviction in a case. If the jury is never informed that the death penalty could be a potential sentence upon conviction of a particular crime, it is impossible that a juror would abdicate their duty in the merits phase due to their beliefs about the death penalty. In other words, there is no issue of jury nullification if the court and the parties do not unnecessarily inform jurors about a potential death sentence should they find the defendant guilty.

Death qualification in circumstances where the jury will never be asked to determine the appropriate sentence serves no legitimate purpose. Every clearly existing precedent of federal law ties the constitutional validity of the "death qualification" process to a statutory scheme in which a *single* jury determines both culpability at the merits phase of a capital trial, *as well as* sentence during a potential penalty phase. *See Witherspoon v. Illinois*, 391 U.S. 510 (1968) ("[I]n this case the jury was entrusted with two distinct responsibilities: first, to determine whether the petitioner was innocent or guilty; and second, if guilty, to determine whether his sentence should be imprisonment or death"); *Wainwright v. Witt*, 469 U.S. 412 (1985) (jury first determined whether the defendant was guilty, then had "unlimited discretion in choice of sentence" between death and life imprisonment); *Lockhart v. McCree*, 476 U.S. 162 (1986) (unitary jury determined both guilt and punishment in bifurcated capital murder trial); *Uttecht v. Brown*, 551 U.S. 1 (2007) (same).

The purpose of death-qualification is to impanel jurors who are willing to impose the death penalty if warranted under the facts and the law. *Witt*, 469 U.S.

at 445-46. However, in Nebraska, the jury will ***never*** be asked to determine the appropriate penalty in the event of a conviction.  The Supreme Court has never sanctioned the use of death qualification in cases in which the jury does not determine the sentence, and as such, the practice is contrary to and/or an unreasonable application of the above Supreme Court authority.

The Supreme Court's case law on death qualification "stands for the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath*." *Witt*, 469 U.S. at 420 (emphasis in original).  The only way in which a juror's view on the death penalty could theoretically impair the performance of their duties in Nebraska is if the court or the State informs the juror that the death penalty is a potential sentencing option for a different sentencer, *only if* the defendant is found guilty and the jury finds that the prosecution has proven an aggravating circumstance beyond a reasonable doubt.

The Supreme Court has repeatedly said that the above death qualification precedents should be interpreted as "a limitation on the State's power to exclude." *Witt,* 469 U.S. at 423 (citing *Adams v. Texas*, 448 U.S. 38, 47-48 (1980)). The State therefore *does not* have a right to exclude jurors based on their death penalty views when it is possible to keep the issue of the death penalty out of the jurors' minds altogether.

Indeed, informing the jury of a judge's potential sentencing options upon conviction is contrary to the well-established principle that "juries are not to consider the consequences of their verdicts" when the jury has no sentencing function. *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.")

In *Shannon*, the Court held that providing the jury with information about possible sentences is widely considered a practice to avoid at all costs, not encouraged. *See id.* at 586–87 ("[A]s a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense."); *United States v. Polouizzi*, 564 F.3d 142, 162–63 (2d Cir. 2009) ("Although jurors have the capacity to nullify, it is not the proper role of courts to encourage nullification.").

Neb. Rev. Stat. §29-2006(3) provides that "[t]he following shall be good causes for challenge to any person called as a juror or alternate juror, on the trial of any indictment . . . in indictments for an offense the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death." However, this language appears to be a relic from a time period in Nebraska history during which it was widely known that the penalty for murder was a mandatory death sentence. *See St. Louis v. State*, 1 N.W. 371, 373-374 (Neb. 1879) (discussing the statute, then Crim. Code 468, which allowed for disqualification of jurors who did not believe in death penalty under mandatory death penalty scheme). In the late 1800s, the Nebraska legislature then amended

the penalty for murder to either life in prison or the death penalty, with the penalty to be set *by the jury*. *See Hill v. State*, 60 N.W. 916 (Neb. 1894) ("The amendment of 1893, conferring upon juries' discretion to fix the punishment, in case of conviction for murder in the first degree, at imprisonment for life, instead of the death penalty, did not repeal the provision of the Criminal Code making conscientious scruples against capital punishment, in certain cases, ground of challenge for cause.").

There is simply no need to disqualify a juror based on their views on the death penalty under Nebraska's current statutory scheme, (Neb. Rev. Stat. §§29-2521–2522.) That scheme entrusts the jury to determine whether the prosecution has proven a statutory aggravating circumstance beyond a reasonable doubt but requires a three-judge panel to select and impose the sentence.

Nevertheless, Nebraska has continued the practice of death qualification when there is no jury death determination. In justifying the authorization of death qualification, Nebraska has presumed that a prospective juror's views against capital punishment may skew his or her verdict in determining guilt. *See, e.g.*, *State v. Rust*, 388 N.W. 2d 483, 495-496 (Neb. 1986) (rejecting implicit Sixth and Fourteenth Amendment fair cross-section challenge to death-qualification statute on the basis that *Witherspoon* held that "it was permissible to exclude from jury service those who, because of scruples against the death penalty, would be unable to return a verdict of guilty regardless of the evidence") (*citing State v. Williams,* 352 N.W. 2d 538 (Neb. 1984)).  Thus, the analysis in *Rust* and the cases upon which it relies is premised on the fact that jurors *know* the death penalty is a potential

sentencing option—something that, in violation of *Shannon*, jurors are only told through the process of death qualification.

The unreasonable fallacy of Nebraska's death qualification process is that it prohibited Mr. Trail from life qualifying pursuant to *Morgan v. Illinois*, 504 U.S. 719 (1992). Nebraska has erroneously reasoned that *Morgan* does not apply in Nebraska capital cases because Nebraskan juries do not ultimately weigh the aggravating circumstances against the mitigating circumstances in a capital murder trial. However, this distinction is meaningless and turns the reason for death qualification on its head; the State of Nebraska acted contrary to and/or unreasonably applied clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

In *Morgan*, 504 U.S. at 724, the Supreme Court found error and reversed despite each of the empaneled jurors affirmatively stating they could be fair and impartial. The Court explained:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* at 729. Now, *Morgan* entitles defendants to question prospective jurors during voir dire whether they would impose death "regardless of the facts and circumstances of conviction." *Id.* at 735-36. If a juror predetermined Mr. Trail's

112

death sentence due to vehement support for the death penalty, the juror's verdict is based on matters "entirely irrelevant . . ." to their determination. *Morgan*, 504 U.S. at 729.

In Nebraska, only defendants who are facing the death penalty are forced to go to trial before conviction-prone juries, whereas non-capital defendants who go to trial lack this distinct disadvantage. Instead of the "heightened reliability" required by the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment, Mr. Trail received fewer protections due to his status of being death eligible.

The Sixth Amendment right to jury trial is "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely v. Washington*, 542 U.S. 296, 305-06 (2004). Procedures or laws that create classifications that burden fundamental rights trigger heightened scrutiny. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). The practice of death qualification when the jury does not determine sentence cannot survive scrutiny, because it impermissibly and unjustifiably burdens a capital defendant's fundamental Sixth Amendment right to trial by jury by generating juries that are conviction-prone, while sparing non-capital defendants from this detrimental burden. The Court held more than half a century ago: "[O]ur own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim

113

of our entire judicial system—all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Griffin v. Illinois*, 351 U.S. 12, 17 (1956) (internal quotations and citations omitted); *See also Douglas v. California*, 372 U.S. 353, 355-56 (1963).

There is no compelling state interest justifying the exclusion of "*Witherspoon* excludable" jurors who cannot impose the death penalty from juries tasked with evaluating the merits (i.e. a defendant's guilt or non-guilt) of a criminal case as to one class of first-degree murder defendants but not as to another. The interest in seeking the death penalty is the only possible justification for the exclusion of prospective jurors who are opposed to capital punishment—an interest laid bare by prohibiting the comparable right to life qualify. The only legitimate interest the State can claim to have is an interest in having jurors who can fairly consider the merits phase evidence; if jurors are not told of possible sentencing options, this is exactly what will happen. The State has no valid interest in excluding fair jurors, whereas "a defendant [] has an interest in a completely fair determination of guilt or innocence." *Witherspoon*, U.S. at 20, fn. 18.

Accordingly, the practice of death qualification, when also not permitting life qualification, is constitutionally invalid. This improper process taints the conviction obtained against Mr. Trail by excluding prospective jurors via death qualification. Because the Nebraska Supreme Court acted contrary to and/or unreasonably applied *Witherspoon*, *Witt*, *Shannon* and *Morgan* and/or made an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(1) and (2), the Court should grant

114

the writ, vacate the convictions and death sentence, and remand for new proceedings in state court.

### Claim 18:   Mr. Trail was coerced into waiving his right to a jury trial in violation of *United States v. Jackson* and *Ring*.

A statutory scheme that penalizes a defendant who exercises his constitutional right to a jury trial under the Sixth Amendment is itself unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the decision in *United States v. Jackson*, 390 U.S. 570 (1968), and its progeny. The separate findings lead to a *Ring* violation. The Nebraska Supreme Court's holding otherwise is contrary to and/or an unreasonable application of clearly established United States Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The aggravating circumstances in Nebraska Revised Statutes § 29-2523(1) provide for multiple "prongs" and facts that may exist to support the existence of the aggravating circumstances. The number and type of "facts" that might support an aggravating circumstance has been expanded by Nebraska Supreme Court opinions that have attempted to define aggravating circumstances. For example, aggravating circumstance 1 (d) may have between five and six different "facts" that would support a finding of the aggravator.

The Nebraska capital sentencing scheme provides that if a defendant waives his right to a jury trial as guaranteed by the Sixth Amendment to the United States Constitution, the defendant receives the procedural benefit of a unanimous

determination of each "fact" in support of an aggravating circumstance made in writing. The operation of this statute coerced a jury waiver by Mr. Trail.

Nebraska Revised Statute § 29-2521(2) states as follows:

In the sentencing determination proceeding before a panel of judges when the right to a jury determination of the alleged aggravating circumstances has been waived, . . . The panel **shall** make written findings of fact based upon the trial of guilt and the sentencing determination proceeding, identifying which, if any, of the alleged aggravating circumstances have been proven to exist beyond a reasonable doubt. Each finding of fact with respect to each alleged aggravating circumstance shall be unanimous. If the panel is unable to reach a unanimous finding of fact with respect to an aggravating circumstance, such aggravating circumstance shall not be weighed in the sentencing determination proceeding. After the presentation and receipt of evidence and argument, the panel shall determine an appropriate sentence as provided in section 29-2522.

(emphasis added).

On the other hand, if a defendant exercises his Sixth Amendment right to a jury trial as provided in Nebraska Revised Statutes § 29-2520(e), (f), the jury is not required to unanimously find each "fact" in support of finding of an aggravating circumstance, but only that the aggravating circumstance exists. The jury is not required to make any written findings regarding the facts necessary to support the finding of an aggravating circumstance.

In this circumstance, Mr. Trail's sentence of death was also imposed in violation of his right to trial by jury and his right to due process of law, as guaranteed by the Sixth and Fourteenth Amendments, and in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment, because the statute

coerced the waiver of a determination by a jury of his peers. *Ring v. Arizona,* 536 U.S. 384 (2002).

A statutory scheme that penalizes a defendant who exercises his constitutional right to a jury trial under the Sixth Amendment is itself unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the decision in *Jackson.*, and its progeny. Nebraska's death sentencing scheme is structured such that a defendant is coerced into waiving his constitutional right to a jury determination of aggravating circumstances. The statute, at the very least, "needlessly chill[s]" the exercise of his right to a jury. *See Jackson*, 390 U.S. at 582.

This issue has not been currently presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez,* 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, this Court should grant the writ, vacate the convictions and death sentence, and remand for new proceedings in state court.

**Claim 19:** **Mr. Trail's death sentence violates the cruel and unusual punishment clause of the Eighth Amendment because he is severely mentally ill and counsel was ineffective for failing to raise this issue at trial or on direct appeal.**

The Eighth Amendment restricts the ultimate sanction of capital punishment "to those offenders who commit 'a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)). To that end, the Supreme Court "insists upon confining the instances in which the punishment can be imposed." *Kennedy*, 554 U.S. at 420. The Court has recognized several categorical restrictions on the death penalty, including forbidding the execution of offenders who raped but did not kill, *Kennedy*, 554 U.S. at 420; *Coker v. Georgia*, 433 U.S. 584, 592 (1977); forbidding the execution of an offender who did not himself kill or intend to kill a victim, *Enmund v. Florida*, 458 U.S. 782, 788 (1982); and prohibiting the execution of juveniles and of individuals who are intellectually disabled. *Roper*, 543 U.S. at 578-79; *Atkins*, 536 U.S. at 321. The Court has determined that such executions run afoul of the Eighth Amendment prohibition on cruel and unusual punishment. For many of the same reasons that the Court has exempted the above categories of offenders from the death penalty, there is a strong historical and legal basis for exempting severely mentally ill offenders from the death penalty.

Historically, execution of the severely mentally ill has long been recognized as inherently "inappropriate" and "unjust." As the Supreme Court has noted, the

prohibition against executing a severely mentally ill prisoner "bears impressive historical credentials," *Ford v. Wainwright,* 477 U.S. 399, 406 (1986), dating back in English common law to the Eleventh and Thirteenth Centuries. *Id.* at 406 (citing W. Blackstone, Commentaries. 4: 24-25 (1769)). "[T]he practice consistently has been branded 'savage and inhuman,'" and "a miserable spectacle, both against Law, and of extreme inhumanity and cruelty, and can be no example to others." *Ford*, 477 U.S. at 406 (*citing* E. Coke, Institutes, Sixth Edition; 3: 6 (1680)).

In determining whether the implementation of the death penalty is a proportionate punishment for a group of offenders under the Eighth Amendment, the Supreme Court mandates consideration of "the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12 (*citing Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)); *see also Graham v. Florida*, 560 U.S. 48, 58 (2010); *Roper*, 543 U.S. at 561. In examining such evolving standards, the Court has often looked to various factors, including whether there is a national legislative or legal consensus against the application of capital punishment to the class of offenders and whether there is a broader social and professional consensus against executing individuals in that group. *Atkins*, 536 U.S. at 312; *Roper*, 543 U.S. at 564. While considering the national, professional, and international consensus regarding punishment of a particular category of offenders, the Court also assesses whether "there is reason to disagree with the judgment reached by the citizenry and its legislators." *Atkins*, 536 U.S. at 313.

"Severe mental illness" generally refers to "mental disorders that carry certain diagnoses, such as schizophrenia, bipolar disorder, and major depression; that are relatively persistent (e.g. lasting at least a year); and that result in comparatively severe impairment in major areas of functioning." American Bar Association, *Severe Mental Illness and the Death Penalty*, 1 (December 2016). Individuals with severe mental illness have many of the same characteristics the Court found rendered the death penalty a disproportionate punishment for juveniles and those with intellectual disabilities. *See* Christopher Slobogin, *What Atkins Could Mean for People with Mental Illness*, 33 N.M. L. Rev. 293, 304 (2003). Additionally, severe mental illness can "strongly affect defendants' decision-making about their defense, leading them to refuse to cooperate with their attorneys." ABA, *Severe Mental Illness and the Death Penalty* at 3. And "research has shown that mental illness can be erroneously interpreted by jurors," especially "when a defendant has a bizarre or flat affect in the courtroom." *Id.* These types of impairments "make it less defensible to impose the death penalty as retribution for past crimes and less likely that the death penalty will have a real deterrent effect." *Roper*, 543 U.S. at 563 (citing *Atkins*, 536 U.S. at 318-19).

On August 8, 2006, the American Bar Association House of Delegates, in language already previously adopted by the American Psychological Association and the American Psychiatric Association, unanimously passed a resolution condemning the execution of severely mentally ill offenders. This resolution is in keeping with the prevailing professional and scientific consensus against executing the severely

mentally ill, as well as numerous states that have passed laws exempting such individuals from the implementation of the death penalty, and a longstanding international movement against executing the severely mentally ill.

The American Bar Association, long recognized as the leading legal organization in the country, has had its Guidelines pertaining to limitations on the utilization of the death penalty cited and adopted by the United States Supreme Court on numerous occasions. *See, e.g.*, *Wiggins*, 539 U.S. 510; *Florida v. Nixon*, 543 U.S. 175 (2004); *Rompilla*, 545 U.S. 374. Thus, it is profoundly significant that the ABA House Of Delegates has unanimously set forth a Resolution calling for the prohibition of the death penalty for defendants suffering a severe mental disorder or disability, and even more significant that such Resolution is in keeping with prevailing professional, national, and international norms.

Mr. Trail clearly fits the parameters of this Resolution and the prevailing consensus against sentencing the severely mentally ill to death. Mr. Trail attempted suicide in front of the jury in the middle of his trial. His resulting absence from trial and inability to assist his counsel in his case—products of his severe mental illness—fit squarely into the concerns that courts, state legislatures, the American Bar Association, and mental health professionals have raised about subjecting the severely mentally ill to the death penalty. In light of Mr. Trail's severe mental illness, executing him would violate the Eighth and Fourteenth Amendments.

Due to trial counsel's deficient investigation into Mr. Trail's background, including his mental illness and psychiatric history, even after his in-court suicide attempt, counsel failed to raise this issue at trial or on direct appeal. These failures amounted to ineffective assistance counsel at trial and on direct appeal and prejudiced Mr. Trail in violation of his rights under the Sixth and Fourteenth Amendments. *Strickland*, 466 U.S. 668.

This issue has not currently been presented in state court. This failure is due to the postconviction court's refusal to provide counsel and funding. In the alternative, the failure to raise this issue in state court was due to the ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel. *Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1 and/or *Maples*, 565 U.S. 266 he is entitled to develop and present this ground for relief in this Court. On the merits, due to Mr. Trail's severe mental illness, this Court should grant the writ and vacate his death sentence.

**Claim 20:  The trial court erred in permitting the State to violate a statute mandating the sequestration of witnesses by improperly modifying the sequestration of witness order in violation of the Due Process Clause.**

Prior to the State's first witness, Mr. Trail moved to sequester the witnesses. The State had no objection to the motion and requested it be made reciprocal. The motion to sequester witnesses was granted as to each of the witnesses for the State and Mr. Trail. In granting the motion, the trial court stated: "[t]he Court will grant the Motion to Sequester. I know there are no witnesses in here right now, but this

will be the Court's rule. They are to remain out of the courtroom except when called to testify. After testifying, they may not discuss their case or their testimony amongst any other witnesses or with any other person other than counsel. Counsel are advised to advise – counsel are advised to tell their respective witnesses the Court's rule of sequestration, and each of them shall be governed thereby." Tr. 84-85.

The State's first witness was Mrs. Susan Loofe. Tr. 141-206. Following her testimony, the State moved to release her from her subpoena and asked to waive sequestration for her. Tr. 206. Mr. Trail's objection was overruled by the court and she was allowed to remain in the courtroom. Tr. 206-210. At the close of the defense case, trial counsel informed the court that "the possibility exists of us re-calling Susan Loofe to the stand," but "we are reluctant to do so. In fact, we're not going to do so because she has been allowed to sit in the courtroom throughout the entire trial in the front row, and I just don't think that we can get the accurate testimony that we're looking for as she has heard all of the witnesses." Tr. 3893-94. Trial counsel raised this issue again in their motion for a new trial after the verdict. Tr. 4126-27.

Neb. Rev. Stat. § 27-615 states that "[a]t the request of a party the judge *shall* order witnesses excluded so that they cannot hear the testimony of other witnesses." (emphasis added). The exceptions to this rule are (1) a party, which Mrs. Loofe was not, (2) the State's representative, which Mrs. Loofe was not, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause. Here, there was no such showing.

123

Mr. Trail complied with Neb. Rev. Stat. § 27-615 by requesting that all witnesses be sequestered and the Court entered an order to that effect. Mrs. Susan Loofe was the first witness for the State and the defense objected to the State's request to release her from sequestration because she was subject to recall. Over the defense objection, the Court made the decision to allow Mrs. Loofe to remain in the courtroom for the balance of the trial despite its previous order and in contravention of the statute. Tr. 947-49.

Mrs. Loofe remained in the front of the courtroom for the majority of the balance of the trial, within sight of the jury, and was able to hear the testimony of the other witnesses, which is precisely what § 27-615 is designed to prevent. By stating that a judge ***shall*** order witnesses excluded, the statute makes it clear that such an order is not left up to the discretion of the judge and is therefore an abuse of discretion and an error of law.

Nebraska's statute derives from Rule 615 of the Federal Rules of Evidence. In the Comment to Proposed Rules of Evidence, Rule 615 (August I, 1973), the note states that "The authority of the judge is admitted, **the only question being whether the matter is committed to his discretion or one of right**. The rule takes the latter position." *Id*. (emphasis added). The matter of sequestration is one of right and not left up to the discretion of the judge. The trial court's refusal to follow the Nebraska statute deprived Mr. Trail from receiving a fair trial and was an abuse of discretion. Mr. Trail's due process rights were violated by the prosecutor's request and the trial court's assenting to that request to violate a statute.

124

Because the Nebraska Supreme Court acted contrary to and/or unreasonably applied federal, this Court should grant the writ, vacate the convictions and death sentence, and remand for new proceedings in state court. *See* 28 U.S.C. § 2254(d)(1) and (2).

> **Claim 21:   Mr. Trail's Sixth, Eighth, and Fourteenth Amendment rights were violated by the State of Nebraska when the district court did not receive and review sentencing orders from all Nebraska first degree murder cases for purposes of proportionality review.**

The Nebraska Supreme Court acted contrary to and/or unreasonably applied clearly existing federal law by refusing to consider the mitigation evidence presented by Mr. Trail related to the life sentences imposed in other potentially capital cases, which presented facts worse than his but received a life verdict. *See* Ex. 920. Further, by the time the Nebraska Supreme Court found Mr. Trail's death sentence to be proportional, his co-defendant had received a life sentence.  Yet, the court did not consider this in the proportionality review it conducted.

It is well settled law that, while the Eighth Amendment does not require a court to engage in a proportionality review, *Pulley v. Harris*, 465 U.S. 37 (1984), where a state creates a right to proportionality review, the due process clause entitles the Defendant to "procedures that ensure that the right is not arbitrarily denied." *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) (citing *Wolff v. McDonnell*, 418 U.S. 538, 557 (1974)); *see Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the

exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.") *(citing Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979)). What the Constitution does not allow is the application of confirmation bias in the proportionality review. Therefore, the Nebraska Supreme Court's failure to grant Mr. Trail relief is contrary to or an unreasonable application of well-established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The plain language of Nebraska's sentencing statutes requires that the sentencing panel consider evidence related to the question whether a death sentence in a particular case is "excessive or disproportionate to the penalty imposed in similar cases." R.R.S. Neb. § 29-2522(3). This creates a liberty interest in persons convicted of first-degree murder by forbidding the imposition of a death sentence before a sentencing panel compares the facts of the defendant's case with the facts and the penalties imposed in similar cases. The abrogation of such a liberty interest violates a defendant's right to due process and results in an arbitrarily imposed death-sentencing scheme.

Contrary to the plain language of the statute, the Nebraska Supreme Court erroneously interpreted § 29-2522(3) to require the sentencing panel to limit its proportionality review only to other cases in which the death penalty has been

imposed. *Trail*, 981 N.W. 2d at 312-313. The logical infirmity of this interpretation can be found in the Nebraska Supreme Court's own case law: "We have . . . repeatedly held that proportionality review under § 29-2521.03 looks only to other cases in which the death penalty has been imposed." *State v. Bjorklund*, 604 N.W. 2d 169, 213 (Neb. 2000) (citations omitted). Considering only those cases in which death has been imposed is an after-the-fact consideration: having first already determined that the death penalty is the appropriate sentence, the sentencing panel looks to other cases in which the death penalty has been imposed to reach the tautological conclusion that the death penalty is not disproportionate to the death penalty. *See Stale v. Lotter*, 586 N.W. 2d 591, 637-38 (Neb. 1998) (Connolly, J., concurring) ("The obvious fallacy in this reasoning is that a death sentence cannot be 'greater than' or 'disproportionate to' another death sentence.").

Judicial deconstruction of a Legislative requirement is faulty. Indeed, § 29-2522(3) demands more. It demands that the sentencing panel look at similar cases prior to deciding what penalty should be imposed and then subsequently determine whether imposing the death penalty would be excessive or disproportionate based on a comparative analysis. Such similar cases were presented to the sentencing court, augmented by the life sentence returned against the co-defendant when Mr. Trail's death sentence was being considered by the Nebraska Supreme Court. Yet, the courts refused to consider them.

The trial court's refusal to consider Mr. Trail's proffered evidence of sentences imposed in similar cases is contrary to *Lockett*, 438 U.S. 586, and its progeny. First,

in *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), a plurality of justices held that the Eighth Amendment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Two years later, *Lockett* held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest capital case, not be precluded from considering, as a mitigating factor . . . any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original). The Court went on to state that, "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to . . . circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Id.* at 605. The Nebraska Supreme Court has also recognized the constitutional import of *Lockett* and has held "that the trial court shall, in addition to considering the aggravating and mitigating circumstances set forth in section 29-2523. R.R.S. 1943, likewise consider any matter relevant to the imposition of the sentence." *State v. Holtan*, 287 N.W. 2d 671, 674 (Neb. 1980).

When the State provides for a proportionality review, as Nebraska does, the defendant is entitled to put into evidence cases which he proffers as a basis for a sentence less than death. This is further supported by the consistent liberalization of mitigating evidence which may be proffered. *See Lockett*, 438 U.S. at 604. The Nebraska Legislature has already recognized that the sentences imposed in similar

cases are "factors which may call for a less severe penalty." *See* R.R.S. Neb. § 29-2522(3). The State of Nebraska denied Mr. Trail the right to compare his case to others where death was not imposed. Without the benefit of a comparison to other first degree murder cases in which a life sentence was imposed, including that of his co-defendant, Mr. Trail was deprived of the opportunity to proffer evidence as a basis for a sentence less than death.

Therefore, the Nebraska Supreme Court's failure to grant Mr. Trail relief is contrary to or an unreasonable application of well-established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). The Court should grant the writ, vacate the death sentences and remand for a new sentencing proceeding.

> **Claim 22:   The removal of the jury from the death penalty decision deprives Mr. Trail of his constitutional right to a jury and offends contemporary standards.**

Mr. Trail was sentenced to die under a procedure in which a three-judge panel, rather than a jury, made the critical findings of fact necessary to impose a death sentence. Because a death sentence *cannot* be imposed without these additional judicial findings of fact, Nebraska's capital sentencing scheme violates the fundamental Sixth Amendment requirement that "a jury, not a judge, [] find each fact necessary to impose a sentence of death." *Hurst v. Florida*, 577 U.S. 92, 94 (2016). Nebraska's sentencing scheme also violates the due process requirement that any element of a crime, or fact necessary to a death sentence, must be found by a jury beyond a reasonable doubt. *Id.* at 97. As Nebraska is the only active death penalty jurisdiction that permits judges to make the ultimate life or death

determination, Nebraska's capital sentencing scheme also violates the Eighth Amendment's evolving standards of decency.

This is a historical anomaly from the common law upon which our Nation was founded. Nebraska is an outlier under contemporary and historical standards.

The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Hurst, 577 U.S.* at 94*; Rauf v. State,* 145 A.3d 430, 435 (Del. 2016). In *Hurst*, the Court invalidated Florida's capital sentencing scheme, which preconditioned a death sentence on the trial court alone finding "the facts . . . [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." *Hurst*, 577 U.S. at 100 (quoting Fla. Stat. §775.082(1)). The Court rejected the State of Florida's argument that the Sixth Amendment is satisfied where the jury implicitly finds an aggravating circumstance, noting that the Florida statute "does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.'" *Id. Hurst* thus clarified that the weighing of facts in aggravation and mitigation is a factual determination that must be made by a jury.

Following *Hurst,* the Delaware Supreme Court also struck down that state's death penalty statute under the Sixth Amendment—a statute essentially indistinguishable from Nebraska's. *Rauf*, 145 A.3d 430 (per curiam). Like the now-invalidated capital sentencing schemes in Florida and Delaware, Nebraska's capital

sentencing statute preconditions a death sentence on a three-judge panel making critical findings of fact.

Under Nebraska law, the maximum sentence that a capital defendant can receive based on the jury's verdict alone is life imprisonment. Even where a jury finds one or more aggravating circumstances, a death sentence cannot be imposed unless a three-judge panel makes death-appropriate findings regarding: "(1) Whether the aggravating circumstances as determined to exist justify imposition of a sentence of death; (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Neb. Rev. St. § 29-2522. In contrast to the sentencing procedures followed in non-capital cases, the statute also requires the sentencing panel to make written findings reflecting these factual determinations. *Id.*

Pursuant to the statute, the sentencing panel thus punished Mr. Trail on the basis of matters not found by a jury. Thus, Nebraska's capital sentencing scheme is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments based on *Hurst*, and it is therefore void. The death sentence imposed herein must be vacated.

It is well-established that the Eighth Amendment draws its meaning from "'the evolving standards of decency that mark the progress of a maturing society.'" *Woodson,* 428 U.S. at 301 (*quoting Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 183 (1976), articulated two

benchmarks for gauging whether a punishment practice has fallen outside these evolving standards: (1) "objective ind[ices] of contemporary values, "as evidenced by death penalty legislation and jury verdicts, and (2) whether or not the death penalty "comports with the basic concept of human dignity at the core of the Amendment." 428 U.S. at 180-81.

According to this standard, § 29-2521(1)(a) and (3) violate the Eighth and Fourteenth Amendments. Nebraska is the only active death penalty jurisdiction in the nation that places the death sentencing determination exclusively in the hands of judges. In the rest of the country, the states and federal government demonstrate a near uniform rejection of this practice. Because requiring a jury to determine whether a defendant deserves the ultimate punishment produces more reliable results that are reflective of the community's judgment, the vast majority of death penalty jurisdictions require a jury to determine whether to impose a death sentence. Nebraska is a clear outlier.

Applying the Supreme Court's two-part analysis to Nebraska's capital sentencing procedure, it is clear that Nebraska's sentencing procedure is out of step with contemporary standards of decency. There is now a strong national consensus against judge-imposed death sentences (49-1), reflecting the recognition that jury sentencing determinations are necessary to meet the heightened reliability requirements the Eighth Amendment demands. In almost every jurisdiction that authorizes capital punishment, a death sentence may only be imposed if a jury determines the sentence is warranted.

This consensus is consistent with a clear abandonment of judicially-imposed death sentences in virtually all jurisdictions except Nebraska. Since the last time the Supreme Court visited the question of whether judge-only capital sentencing violated the Eighth Amendment, in *Spaziano v. Florida*, 468 U.S. 447 (1984), overruled in part by *Hurst*, eight of the nine states that had capital sentencing schemes in which judges alone made the factual findings necessary to impose a death sentence—Alabama, Arizona, Colorado, Delaware, Florida, Idaho, Indiana, and Montana—have abandoned this practice, while Nebraska remains the sole outlier. Arizona, Colorado and Idaho amended their statutes after *Ring v. Arizona* to require jury sentencing on all findings necessary to impose the death penalty. Florida, Alabama, and Indiana abolished judicial override procedures that permitted a judge to override a jury's life verdict. Indiana modified its statute in 2002 after *Ring*, and Florida and Alabama did so in 2017 following *Hurst*. Delaware struck down its judge-only capital sentencing scheme after *Hurst*, in *Rauf*, and then invalidated all remaining death sentences in *Powell v. Delaware*, 153 A.3d 69 (Del. 2016). This leaves Nebraska alone as the only active death penalty jurisdiction that places the death sentencing determination exclusively in the hands of judges.

That only one active death penalty jurisdiction permits a death sentence to be imposed by a judge, rather than a jury, and that there is a noticeable trend away from judicial death sentencing, weighs heavily against its constitutionality. The scarcity of state laws permitting capital sentencing without a jury penalty verdict is

"strong evidence of consensus that our society does not regard this [procedure] as proper or humane." *Hall*, 572 U.S. at 718.

In addition, death sentences imposed by judges fail to reflect the community consensus and are not sufficiently reliable to comply with the Eighth Amendment. "[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct," *Gregg*, 428 U.S. at 183, and a sentence of death thus "expresses the community's judgment that no lesser sanction will provide an adequate response to the defendant's outrageous affront to humanity." *Harris v. Alabama*, 513 U.S. 504, 518 (1995) (Stevens, J., dissenting) (citing *Gregg*, 428 U.S. at 184). For this reason, jurors "possess an important comparative advantage over judges . . . [because] they are more likely to express the 'conscience of the community' on the ultimate question of life or death." *Ring*, 536 U.S. at 615-16 (Breyer, J., concurring in the judgment) (citation omitted); *see also Woodward v. Alabama*, 571 U.S 1045, 1051 (2013) (Sotomayor, J., dissenting from denial of certiorari) (noting that "[b]y permitting a single trial judge's view to displace that of a jury representing a cross-section of the community, Alabama's sentencing scheme has led to curious and potentially arbitrary outcomes").

The severity and irrevocability of a death sentence "argues strongly for procedures that will help assure that, in a particular case, the community indeed believes application of the death penalty is appropriate, not 'cruel,' 'unusual,' or otherwise unwarranted." *Ring*, 536 U.S. at 618 (Breyer, J., concurring in the judgment). Because the jury is "uniquely capable of determining whether, given the

community's views, capital punishment is appropriate in the particular case at hand," *id*. (Breyer, J., concurring in judgment), concerns about reliability demand that "the decision to impose the death penalty is made by a jury rather than by a single governmental official." *Spaziano,* 468 U.S. at 469, overruled in part by *Hurst,* 577 U.S. at 103 (Stevens, J., concurring in part and dissenting in part).

Mr. Trail's death sentence was imposed by a three-judge sentencing panel. No jury was able to act on its own collective conscience to express the conscience of the community by determining whether the death penalty was appropriate and warranted in his individual case.

Where, as in Nebraska, a death penalty scheme is contrary to the national consensus, fails to adequately implement Supreme Court precedent, and undermines rather than promotes the reliability of capital sentencing proceedings, that practice is necessarily invalid under the Eighth Amendment. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).  This Court should grant the writ and vacate the death sentence with directions to impose life.

### Claim 23:  The State suppressed material and exculpatory evidence.

The prosecution has a duty to disclose evidence that is favorable to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). This duty extends beyond direct evidence of innocence and applies to evidence that may be used to impeach the credibility of the prosecution's witnesses. *United States v. Bagley*, 473 U.S. 667, 682

135

(1985). *Brady* also imposes a critical concomitant duty on the prosecution to personally become aware of potentially exculpatory evidence in the possession of other government actors. *Kyles v. Whitley*, 514 U.S. 419 (1995). The State's failure to disclose exculpatory evidence violates federal due process if the suppressed evidence is constitutionally material. *Id.*  Materiality relates to both guilt and penalty.

"[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Id.* (quoting *Kyles*, 514 U.S. at 434). In determining whether the suppressed evidence was material, courts must consider the **cumulative effect** of all the suppressed evidence. *Kyles*, 514 U.S. at 434; *United States v. Madrigal*, 152 F.3d 777, 782 (8 Cir. 1998).

The state's duty to disclose exculpatory information is ongoing. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).  For evidence known to the state at the time of the trial, this ongoing duty to disclose extends throughout all legal proceedings that may affect either guilt or punishment, including post-conviction proceedings.  *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007). *See also Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (*citing Ritchie* for the proposition that

"the duty to disclose is ongoing and extends to all stages of the judicial process");
and *High v. Head*, 209 F.3d 1257, 1265, n. 8 (11th Cir. 2001) (reiterating and
applying language in *Ritchie* imposing upon the state an ongoing duty to disclose
exculpatory information in habeas corpus proceedings).

This issue has not currently been presented in state court. This failure is due
to the postconviction court's refusal to provide counsel and funding. In the
alternative, the failure to raise this issue in state court was due to the
ineffectiveness or effective abandonment of Mr. Trail's postconviction counsel.
*Maples*, 565 U.S. at 281. Should the state assert that this ground is not properly
before this Court for review, Mr. Trail will argue that under *Martinez*, 566 U.S. 1
and/or *Maples,* 565 U.S. 266 he is entitled to develop and present this ground for
relief in this Court. On the merits, this Court should grant the writ, vacate the
conviction, and order a new trial. On the merits, this court should grant the writ
and order a new trial and/or aggravation proceeding and/or penalty proceeding.

### Claim 24:  Nebraska does not provide an adequate and corrective post-conviction process.

Under principles of comity and federalism, Nebraska defendants such as Mr.
Trail are required to provide Nebraskan courts the first opportunity to correct
federal constitutional violations. The Nebraska Legislature passed a post-conviction
relief statute, R.R.S. Neb. §§  29-3001 - 3004, with the obvious intent to provide
"available state procedures to [comply with] the **requirement** that prisoners be

given some clearly defined method by which they may raise claims of denial of federal rights." *Young v. Ragen*, 337 U.S. 235, 239 (1949) (emphasis added).

While this type of review is not constitutionally mandated, *see Murray v. Giarratano*, 492 U.S. 1 (1989), nevertheless, once established, the post-conviction procedure must comport with, and be enforced to effectuate, due process. *Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause.")

An adequate corrective process should be "swift and simple and easily invoked," should "eschew rigid and technical doctrines of res judicata of forfeiture, waiver or default," and should "provide for full fact hearings to resolve disputed factual issues." *Case v. Nebraska*, 381 U.S. 336, 346-47 (1965) [6] (Brennan, J., concurring); *Goldberg v. Kelly,* 397 U.S. 254 (1970); *Evitts*, 469 U.S. at 401.

Critically, Justice Brennan noted that the new Nebraska statute had real hope due to the "[p]rovision for counsel to represent prisoners, as in § 4 of the Nebraska Act, would enhance the probability of effective presentation and a proper disposition of prisoners' claims." *Id.* at 347; *see* R.R.S. Neb. § 29-3004 ("The attorney or attorneys shall be competent and shall provide effective counsel.").

---

[6] In *Case*, the Supreme Court  granted certiorari to determine whether the Fourteenth Amendment required states to afford prisoners "some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Id.* at 337.

138

However, Nebraska has utterly failed Mr. Trail in this regard — he has remained without counsel for far too long and was constructively denied counsel via court rulings for another improperly long stretch of time.

As noted previously, Mr. Trail assiduously sought attorney representation. On December 4, 2022,[7] Mr. Trail mailed for filing a motion requesting counsel with the Nebraska Supreme Court stating:



(highlight added).

When the Nebraska Supreme Court denied that request, on December 21, 2022,[8] Mr. Trail mailed for filing another motion, this time to the district court, requesting counsel stating:

---

[7] The Nebraska Supreme Court docketed the mailed filing on December 7, 2022.
[8] The trial court docketed the mailed filing on January 3, 2023, a delay of thirteen days from mailing.



(highlight added).

In spite of his immediate, diligent, and repeated requests for counsel, Mr. Trail remained without counsel for almost three months, from December 2, 2022, through February 21, 2023 — 81 days. Those 81 days are attributable to both the Nebraska Supreme Court and the trial court.

The delays and deprivation of counsel do not end there. The following chart details the additional days attributable solely to the trial court.

140

| Event | FiledDate | Resolved Date | Days Without Counsel | Days Constructively Without Counsel |
|-------|-----------|---------------|----------------------|-------------------------------------|
| *Pro Se* Request for Counsel | 12/21/22 | 2/21/23 (counsel appointed) | 62 days | |
| Counsel's withdrawal request | 8/24/23 | 9/8/23 (withdrawal permitted; 2 new counsel appointed) | 15 days (while withdrawal pending) | 184 days (docket reflects nothing done) |
| One counsel's withdrawal request | 12/7/23 | 12/8/23 | | |
| **Total Days:** | | | **77** | **184** |

In the trial court, Mr. Trail endured at least 77 days without counsel and was constructively denied counsel for another 184 days. Adding the deprivation of counsel while Mr. Trail's case was still before the Nebraska Supreme Court, the 77 days grows to 96 days. This deprivation deprived Mr. Trail of due process.

Access to counsel is critical to the determination of whether a post-conviction process complies with the Constitution. In *Murray v. Giarratano*, the Court upheld a challenge to Virginia's post-conviction procedure by a 5-4. Notably, Justice Kennedy (joined by Justice O'Connor) concurred, finding the decisive factor for them was that, "[w]hile Virginia has not adopted procedures for securing representation that are as far reaching and effective as those available in other States, no prisoner on death row in Virginia has been unable to obtain counsel to represent him in postconviction proceedings, and Virginia's prison system is staffed with

institutional lawyers to assist in preparing petitions for post-conviction relief." *Id.* at 14-15 (Kennedy, J., concurring).

As Justice Kennedy stated: "The complexity of our jurisprudence in this area, moreover, makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law." *Id.* at 14. Applying this principle of clearly existing federal law, there were no institutional lawyers available to Mr. Trail — indeed, his first appointed post-conviction counsel had to withdraw when he joined the single statewide quasi-public defense institution that exists in Nebraska. That Mr. Trail experienced 77 days without counsel and was constructively denied counsel for another 184 days means he has been deprived of a constitutionally adequate process in post-conviction.

In capital proceedings, the Supreme Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. *Spaziano*, 468 U.S. 447, 456; *Woodson*, 428 U.S. 280, 305 (plurality opinion). A state procedure must give the plaintiff a fair and reasonable opportunity to have the claim discovered, heard, and determined by the state courts. *Michel v. Louisiana*, 350 U.S. 91, 93 (1955); *Parker v. Illinois*, 333 U.S. 571, 574 (1941). The right to object to a federal constitutional violation presupposes a reasonable opportunity to exercise that right. *Reece v. Georgia,* 350 U.S. 85, 89 (1955). But such opportunity has not been available to Mr. Trail due to Nebraska's failure to provide him with an adequate and corrective post-conviction process.

Mr. Trail moved for funds for investigative resources to support his post-conviction petition.  11/08/23 Motion for Mitigation Investigator. In response, the State opposed, but was unable to then articulate a basis for its opposition, stating: "the undersigned will reserve identifying the bases for the objection until he has a better sense of the reasons why he is objecting." 11/16/23 Opposition, p. 1. The trial court took the State's bait and denied the request as premature, even though postconviction counsel made clear that the funds were necessary for Mr. Trail to exercise his right to post-conviction relief. 12/15/23 Order Denying.

Nebraska's post-conviction process places a heavy burden on Mr. Trail to set forth operative facts warranting further review.  Mr. Trail and other indigent inmates face the insurmountable burden of collecting evidence in support of valid claims prior to the filing of a petition **without the means** to collect information critical to their claims.  Absent funds for the reasonable and necessary expert and investigative assistance to properly investigate, prepare, and litigate the post-conviction petition, it is impossible for Mr. Trail to fully and fairly develop the factual bases for his claims and to fully and fairly present those claims to the state courts.  Even now, Mr. Trail is still not permitted, due to State interference, to develop his claims via state resources despite his continuing attempts to do so.

Despite the Nebraska post-conviction statute's purpose of providing Mr. Trail a process to develop supporting evidence for his claims, the process in reality functions to allow the adversary to decide those claims without allowing any evidentiary development. This deprives Mr. Trail of due process of law and renders

the post-conviction process inadequate. *See Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) (state court's failure to provide petitioner with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA); *Thompson v. Bell*, 580 F.3d 423, 436 (6th Cir. 2009). Similarly, in *Panetti v. Quarterman*, 551 U.S. 930, 948–52 (2007), the Court specifically relied on the state's failure to provide a process in competency proceedings in finding § 2254(d) was satisfied.  The Court found AEDPA did not apply due to the failure to accord the petition a "rudimentary process."  *Id.* at 952.

The Nebraska Legislature established a post-conviction procedure to effectuate the constitutional rights of those individuals convicted of criminal offenses.  Assuming *arguendo* that those procedures do not emanate directly from clear constitutional provisions, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause."  *Evitts*, 469 U.S. at 401. Nebraska's procedures for post-conviction review at both the trial and appellate court levels must comport with the constitutional requirements of due process. A viable, fair, effective means for Mr. Trail to raise collateral challenges to his criminal conviction and sentence is all the more critical here because Mr. Trail's "life" interest (protected by the "life, liberty and property" language in the Due Process Clause) is at stake in the proceeding.  *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998).  Death is different; for that reason, more process is due, not less.  *See Lockett*, 438 U.S. 586; *Woodson*, 428 U.S.

144

at 322. Mr. Trail is entitled to an adequate post-conviction remedy in order to vindicate his federal constitutional rights to effective assistance of counsel, due process of law, equal protection of the law, confrontation of the State's evidence against him, and freedom from cruel and unusual punishment.

This Court should grant a conditional writ ordering Nebraska to provide an adequate and corrective post-conviction process to Mr. Trail.

## Prayer for Relief

WHEREFORE, Mr. Trail prays for the following relief:

1. Issue a show-cause order;

2. That discovery be granted as is necessary for a full and fair resolution of the claims contained in this petition;

3. That leave to amend this petition be granted as appropriate;

4. That an evidentiary hearing be conducted on all disputed issues of fact;

5. That his convictions be vacated; and

6. That the aggravation findings be vacated;

7. That his sentences be vacated and he be resentenced to life

8. That all other appropriate relief be granted.

Dated:  February 8, 2024

Respectfully submitted,

*/s/ Laurence E. Komp*
LAURENCE E. KOMP
Capital Habeas Unit, Chief
*/s/ Meredith Schlacter*
MEREDITH SCHLACTER
Assistant Federal Public Defender
*/s/ Mandi Schenley*
MANDI SCHENLEY
Assistant Federal Public Defender
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-675-0923
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org
Mandi_Schenley@fd.org

*Counsel for Petitioner Aubrey C. Trail*

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2024, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by cooperation of the CM/ECF system.

*/s/ Laurence E. Komp*
LAURENCE E. KOMP
Counsel for Petitioner

## VERIFICATION

Under penalty of perjury, the undersigned declares that he is counsel for Mr. Aubrey Trail, named in the foregoing petition and knows the contents thereof; that the pleading is true to the best of his knowledge; and that he is acting on behalf of Mr. Trail. 28 U.S.C § 2242.

DATED this 8th day of February 2024.

_/s/ Laurence  E. Komp_
LAURENCE E. KOMP
Counsel for Petitioner

147

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Aubrey Trail

**DEFENDANTS**

Rob Jeffreys, Director, Nebraska Department of Corrections

**(b)** County of Residence of First Listed Plaintiff   Johnson
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment

Attorneys *(If Known)*

See Attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [x] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC § 2254

Brief description of cause:
Petition for Writ of Habeas Corpus

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE   02/08/2024

SIGNATURE OF ATTORNEY OF RECORD   /s/ Laurence E. Komp

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Attachment to Civil Cover Sheet Form JS 44 Reverse (Rev. 04/21)

I(c).  Attorneys

Attorneys for Petitioner Aubrey Trail

Laurence Komp, MO Bar Number: 40446
Capital Habeas Unit, Chief

Meredith Schlacter NY Bar Number 321625
Amanda Schenley, OH Bar Number: 102596
Assistant Federal Defenders

FEDERAL PUBLIC DEFENDER WESTERN DISTRICT OF MISSOURI
1000 Walnut St Ste 600
Kansas City, MO 64106
Telephone: (816) 675-0923
Fax: (816) 471-8008
Email: Laurence_Komp@fd.org
Email: Meredith_Schlacter@fd.org
Email: Mandi_Schenley@fd.org

Attorneys for Rob Jeffreys, Director, Nebraska Department of Correctional Services

Michael T. Hilgers, Nebraska Attorney General
James D. Smith, Senior Assistant Attorney General
State of Nebraska Office of the Attorney General
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-2682